**Brad L. HULETT, Plaintiff,**

**v.**

**CITY OF SYRACUSE, Frank Fowler, in his official capacity, William Coleman, individually and in his official capacity, William Galvin, Jr., individually and in his official capacity, Central New York Regional Transportation Authority doing business as CNY Centro, Inc., Michael Robinson, individually and in his official capacity,**

---

Lester Wallace, individually and in his official capacity, Eastern Paramedics, Inc., doing business as Rural/Metro Corporation, Matt Maule, individually, and Kyle Dreverman, individually, Defendants.

5:14–CV–152

United States District Court, N.D. New York.

Signed May 30, 2017

470

LAW OFFICE OF ERIN G. VAN VLECK, LLC, Attorneys for Plaintiff, P.O. Box 83526, Fairbanks, AK 99708, OF COUNSEL: ERIN G. VAN VLECK, ESQ.

GUY LAW FIRM, PLLC, Attorneys for Plaintiff, 3569 Pleasant Valley Road, Syracuse, NY 13215, OF COUNSEL: FREDERICK GUY, ESQ.

CITY OF SYRACUSE LAW DEPARTMENT, Attorneys for Defendants, City of Syracuse, Frank Fowler, William Coleman, and William Galvin, Jr., 233 East Washington Street, 300 City Hall, Syracuse, NY 13202, OF COUNSEL: MARY L. D'AGOSTINO, ESQ.

MACKENZIE HUGHES LLP, Attorneys for Defendants, Central New York Regional Transportation Authority, Lester Wallace, and Michael Robinson, Mackenzie Hughes Tower, 440 South Warren Street, Suite 400, Syracuse, NY 13202, OF COUNSEL: STEPHEN T. HELMER, ESQ., NEIL J. SMITH, ESQ., WILLIAM B. HUNT, ESQ.

GOLDBERG, SEGALLA LAW FIRM, Attorneys for Defendants, Eastern Paramedics, Inc., Matt Maule, and Kyle Dreverman, 5786 Widewaters Parkway, Syracuse, NY 13214, OF COUNSEL: AARON M. SCHIFFRIK, ESQ., HEATHER K. ZIMMERMAN, ESQ., MOLLY M. RYAN, ESQ.

DAVID N. HURD, United States District Judge

## TABLE OF CONTENTS

I. INTRODUCTION... 476

II. BACKGROUND... 477

III. LEGAL STANDARD... 479

IV. DISCUSSION... 480

A. Threshold Matters... 480

1. The Parties' Briefing... 480

2. The Video Evidence... 481

B. The Centro defendants... 483

1. Disability Discrimination... 483

i. Proximate Cause... 484

ii. The Direct Threat Doctrine... 487

2. The § 1983 Medical Indifference Claim against Sup'r Robinson... 488

3. Officer Coleman's Employment Status... 490

C. The City defendants... 491

1. Excessive Force & Assault and Battery... 491

2. False Arrest and Imprisonment... 494

3. Malicious Prosecution... 496

4. Medical Indifference... 497

5. Municipal Liability... 498

 i. Monell liability... 499

 ii. State Law... 502

6. Officer Coleman's Liability under the ADA... 503

D. The Rural/Metro defendants... 504

1. Medical Indifference under § 1983... 504

2. Medical "Negligence" under New York law... 505

3. i. Standard of Care... 505

 ii. Causation... 505

 iii. The Parties' Experts... 506

E. Spoliation... 507

1. The Centro defendants... 508

2. The Rural/Metro defendants... 509

F. Hulett's Magistrate Appeal... 510

V. CONCLUSION... 510

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

Plaintiff Brad Hulett ("Hulett" or "plaintiff") filed this civil rights action seeking compensatory and punitive damages for injuries he sustained on May 3, 2013, when two police officers tasered and forcibly removed him from a public bus after he refused their commands to sit down. Plaintiff's operative complaint asserts claims against three remaining groups of defendants:

First, Hulett asserts a medical indifference claim under 42 U.S.C. § 1983 as well as disability discrimination claims under the Americans with Disabilities Act ("ADA") and New York's Human Rights Law ("NYSHRL") against defendants Central New York Regional Transportation Authority ("Centro"), Centro bus driver Lester Wallace ("bus driver Wallace"), and Centro bus hub supervisor Michael Robinson ("Sup'r Robinson") (collectively the "Centro defendants").

Second, Hulett asserts § 1983 claims for excessive force, false arrest, malicious prosecution, and medical indifference as well as state law claims for negligence, false imprisonment, and assault and battery against defendants City of Syracuse (the "City"), Frank Fowler in his official capacity as Chief of the Syracuse Police Department ("SPD") ("Chief Fowler"), SPD Officer William Coleman ("Officer Coleman"), and SPD Sergeant William Galvin, Jr. ("Sergeant Galvin") (collectively the "City defendants").

Third, Hulett asserts a § 1983 medical indifference claim as well as a state law claim for medical negligence against Eastern Paramedics, Inc., an ambulance service doing business as Rural/Metro Corporation ("Rural/Metro"), and two of its employees: Paramedic Matt Maule ("Paramedic Maule") and Emergency Medical Technician Kyle Dreverman ("EMT Dreverman") (collectively the "Rural/Metro defendants").

The parties have spent the past few years engaged in a protracted period of wide-ranging, contentious discovery[1] that has included, *inter alia*, the assertion of cross-claims between various co-defendants as well as the stipulated dismissal of all of Hulett's claims against Onondaga County, Correctional Medical Care, Inc., and Onondaga County Sheriff's Office employees Kevin Walsh, Sonya Santana, Ralph Messina, and Kevin Murphy.

---

**1.** On May 5, 2015 and on April 27, 2016, appeals by Hulett from certain discovery rulings entered by U.S. Magistrate Judge Andrew T. Baxter were rejected.

In December 2016, the Centro defendants, the City defendants, and the Rural/Metro defendants (collectively "defendants") each moved separately for summary judgment under Federal Rule of Civil Procedure ("Rule") 56. Hulett opposed each of these three motions and cross-moved for summary judgment in his own favor as to each set of defendants.

All six motions were fully briefed and oral argument was heard on April 28, 2017 in Utica, New York. Decision was reserved.[2]

## II. BACKGROUND

On June 18, 1991, when he was about thirteen years old, Hulett was struck by a pair of passing trains as he crossed a set of railroad tracks outside Syracuse, New York. A series of invasive surgeries, including one that resulted in the removal of a portion of his shattered skull, saved plaintiff's life but left him with life-long physical and cognitive injuries, including a paralysis of his left arm, generalized left-side weakness, a visible indentation of his skull, and a noticeably altered speech pattern.

Following the train accident, Hulett completed a lengthy period of post-operative rehabilitation before eventually returning home, where he bounced around to a series of different public schools in the Syracuse area before deciding he "did not care to" graduate. Since that time, plaintiff has managed to live independently in the Syracuse area. And although he does not drive a car and is forced to walk with a noticeable left-sided limp, plaintiff has always managed to navigate the City just fine. Prior to the incident at issue in this case, plaintiff enjoyed bicycling and regularly took advantage of the bus system.

Unfortunately, Hulett has also been in a number bicycle accidents over the years. Of particular note is one that occurred on July 14, 2006, when plaintiff was thrown from his bicycle and run over by a truck pulling a trailer, an event which ruptured his spleen and fractured his spine. Remarkably, plaintiff again recovered but added a serious back problem to his list of permanent injuries. Ever since, plaintiff has preferred to stand rather than sit when he travels by public bus—sitting for any length of time aggravates the pain in his back.

On May 3, 2013, Hulett boarded a Centro bus headed toward the main transit hub located in downtown Syracuse. Once there, plaintiff intended to switch to a different Centro bus that would take him to a Wal–Mart in East Syracuse, where he could purchase a new vacuum cleaner for his apartment. Plaintiff rode in his now-customary standing position on this first bus without incident. According to plaintiff, he has never fallen down while standing on a Centro bus.

At about noon, Hulett reached Centro's main transit hub and switched buses, boarding Centro bus number 1249 driven by Centro bus driver Wallace. A surveillance video submitted by the parties shows that plaintiff boarded the bus without assistance, assumed a standing position on the right side of the aisle behind a yellow or white line, and grasped a vertical pole or grab bar with his good right hand. The video also appears to show that plaintiff was wearing a medical bracelet around his left wrist. According to plaintiff, he had received the bracelet from a hospital the

---

**2.** On March 28, 2017, following the summary judgment briefing, Hulett appealed yet another order entered by Judge Baxter resolving certain lingering disputes between the parties over the payment of experts. That motion has also been fully briefed and will be resolved on the submissions without oral argument.

day before, where he had presented complaining of back pain from a go-cart collision that took place at a local mall.

Before bus 1249 departed, bus driver Wallace told Hulett that he had to take a seat. Plaintiff refused. Wallace then exited the bus and called for his supervisor, Robinson, who boarded the bus along with Officer William Coleman, a uniformed SPD officer who may have been working private security for Centro. Sup'r Robinson instructed Hulett to sit down. When plaintiff again refused, Sup'r Robinson told Officer Coleman "[s]ee if you can't have him have a seat or your [sic] gonna have to take him off [the bus]."

Officer Coleman then told Hulett to sit down or get off the bus. Plaintiff again refused and continued to maintain his standing, right-handed grip on the bus's grab bar. Officer Coleman can be seen making a short-lived attempt to remove plaintiff's right hand from the bus's grab bar and then, following a brief verbal exchange between plaintiff and Sup'r Robinson that occurred while Officer Coleman summoned backup, Sergeant William Galvin, Jr. arrived.

The two SPD officers then boarded the bus and again demanded that Hulett either sit down or exit the bus. When plaintiff again refused to sit, the officers lifted plaintiff's shirt to expose the skin of his back, tasered him at least twice, removed him from the bus head-first, and wrangled him onto the ground outside. The audio transcript of the surveillance video demonstrates that the two officers actually engaged in a brief, but apparently unhurried, discussion about the most effective location to deploy the taser against plaintiff's back. For instance, one officer can be seen gesturing at plaintiff's back while stating "[w]ith the probes that's a direct hit right there."

Once Hulett was on the ground outside, one of the officers can be overheard for the first time telling plaintiff he is "under arrest." As the bus drives away from the transit hub, the surveillance video ends by depicting Sergeant Galvin dragging plaintiff by his right leg some distance across the pavement as plaintiff's left leg remains trapped at an awkward angle underneath his body. Plaintiff suggests one of the officers may have kicked him as well, though the surveillance video does not clearly show that to be the case.

Sergeant Galvin then radioed for paramedics while more SPD officers arrived. At about 12:34 p.m., Paramedic Maule and EMT Dreverman responded to the scene. They checked Hulett's vital signs and then bandaged the taser wounds in his back after an SPD officer removed the probes, which had become "wedged in his back pretty deep[ly]." According to the Rural/Metro defendants, plaintiff repeatedly refused any further medical attention and even marked refusal forms on a computer tablet memorializing that decision. Plaintiff, for his part, acknowledges that he has refused medical treatment for other injuries in the past, but asserts that he did not refuse medical treatment on this occasion and claims that neither Paramedic Maule nor EMT Dreverman ever asked him if he wanted to go to the hospital.

SPD officers then moved Hulett into a transport van and took him to the Onondaga County Justice Center, where he was transferred to a wheelchair and brought in for booking. A second surveillance video shows that although plaintiff repeatedly indicated to Justice Center personnel that he could not bear any weight on his left leg, they initially attempted to get plaintiff to stand up anyway so that they could search his pockets more easily. After a couple failed attempts to get plaintiff to stand under his own power, several officers lifted plaintiff up so that he could be searched in the intake room. Following

this search, Justice Center personnel wheeled plaintiff into a cell and helped him onto a bed.

At around 4:00 a.m. the next morning, one of the Justice Center's deputies took notice of the fact that Hulett had failed to even touch his dinner tray. According to the incident report, plaintiff explained to the deputy that he was unable to reach it because he "couldn't move his body" due to the "pain in his back and legs." The deputy informed Justice Center medical staff, who concluded that plaintiff "needed to go the Hospital to be checked." Another Rural/Metro ambulance was summoned to transport plaintiff to SUNY Upstate Medical University, where he underwent immediate surgery for a fractured left hip.

After Hulett was transferred to the hospital, SPD Officer David Ciciriello decided the best course of action under the circumstances was to release plaintiff by issuing an "appearance ticket," an instrument which charged plaintiff with disorderly conduct and resisting arrest based on the events inside the bus.

On August 29, 2013, following a motion by Hulett's counsel, the criminal charges against him were dismissed for "legal insufficiency" and "in the interest of justice," with the District Attorney's office joining plaintiff's dismissal motion as to the legal insufficiency issue. This lawsuit soon followed.

## III. LEGAL STANDARD

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing FED. R. CIV. P. 56(c)); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248, 106 S.Ct. 2505; see also Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248, 106 S.Ct. 2505.

When summary judgment is sought, the moving party bears the initial burden of demonstrating that there is no genuine issue of material fact to be decided with respect to any essential element of the claim. Anderson, 477 U.S. at 250 n.4, 106 S.Ct. 2505. The failure to meet this burden warrants denial of the motion. Id. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Id. at 250, 106 S.Ct. 2505.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. Jeffreys, 426 F.3d at 553. Accordingly, summary judgment is inappropriate where "review of the record reveals sufficient evidence for a rational trier of fact to find in the [non-movant's] favor." Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002) (citation omitted); see also Anderson, 477 U.S. at 250, 106 S.Ct. 2505 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

Where, as here, the parties have cross-moved for summary judgment, a reviewing court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable infer-

ences against the party whose motion is under consideration." Marcano v. City of Schenectady, 38 F.Supp.3d 238, 246 (N.D.N.Y. 2014) (McAvoy, J.) (citation omitted). In undertaking this analysis, it bears noting that "a district court is not required to grant judgment as a matter of law for one side or the other." Id. (citation omitted); see also Residential Mgmt. (N.Y.) Inc. v. Fed. Ins. Co., 884 F.Supp.2d 3, 7 (E.D.N.Y. 2012) ("Cross-motions for summary judgment do not alter the basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute.").

## IV. DISCUSSION

### A. Threshold Matters

Before turning to the merits of the pending motions, there are a couple threshold issues that require some attention.

### 1. The Parties' Briefing

First, in an effort to simplify matters, the factual recitation set forth above only roughly tracks the parties' proffered outlines of the relevant background material and has instead been supplemented, where appropriate, by other information independently culled from the discovery record.

This amounted to a significant undertaking in its own right, since each set of defendants has filed their own Statement of Material Facts and, in each instance, Hulett has responded by submitting his own response to the moving statement as well as a separate counter-statement of his own. In addition, plaintiff has also filed on the docket an attorney affidavit in opposition to all three of the pending summary judgment motions (and in support of his own cross-motions) that appears to include just about every shred of discovery he conducted in this case. See Van Vleck Decl. ¶¶ 2–107.

Among other things, a review of these dueling submissions reveals that although a somewhat grainy black-and-white surveillance video exists depicting significant portions of Hulett's ill-fated encounter with Centro personnel and law enforcement, the parties nevertheless manage to place in legitimate dispute many of the underlying facts as well as the range of permissible inferences that might be drawn therefrom.

This quasi-independent approach to the record has also proved necessary for an interrelated reason: not only does the content of the parties' lengthy factual submissions appear to conflict in myriad, sometimes subtle, ways, but the accompanying memoranda also include some questionable treatment of the relevant bodies of governing law. Indeed, a thorough review of all of the parties' submissions suggests that relying solely on their guidance to sort everything out might result in leaving some important issues unresolved.

In fairness to defendants, at least some of the confusion reflected in the briefing is attributable to the fact that Hulett's operative complaint is a "shotgun pleading," a document which "incorporates all of the factual allegations preceding [each count]." Croons v. N.Y. State Office of Mental Health, 18 F.Supp.3d 193, 199 (N.D.N.Y. 2014) (observing that "this type of litigation strategy ultimately acts to thwart meaningful legal analysis").

For instance, Hulett contends Officer Coleman may have been acting in some capacity as an employee of Centro during the incident. But rather than treat this issue separately, many of the parties' submissions (and at least some of the parties' discovery) seemingly attempt to simultaneously address claims against him in both his capacity as an SPD officer and as a private security employee of Centro. See, e.g., Am. Compl. ¶ 53.

As a result of this and other issues, confusion reigns: the Centro defendants spend pages of their initial briefing trying to fend off certain § 1983 claims only to have Hulett later concede in his response that many of those claims were not squarely asserted against them in the first place, while the City defendants spend time analyzing phantom ADA claims on Officer Coleman's behalf.[3]

For clarity's sake, this decision tackles these disputes by starting out with a straightforward analysis of the merits of the claims Hulett has obviously pressed in this lawsuit before engaging in a necessary discussion of the various ancillary issues raised by the parties. To the extent one or more of the arguments raised by the parties in their briefing is not addressed in detail here, it has been considered and found to be without merit.

## 2. The Video Evidence

Second, because bus surveillance tapes and a Justice Center booking video play so heavily in the parties' briefing, a quick discussion is in order about how to properly consider this evidence in the current procedural posture, a point at which the Court is essentially tasked with deciding whether or not the case should go to a jury. See, e.g., Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (Cardamone, J.) (emphasizing that "the trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried").

In Scott v. Harris, 550 U.S. 372, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007), the Supreme Court made clear that video evidence submitted in connection with a party's summary judgment motion should ab-solutely be considered in determining whether material issues of fact exist. Id. at 380, 127 S.Ct. 1769 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the [video] record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."); see also Orr v. Copeland, 844 F.3d 484, 491 (5th Cir. 2016) (characterizing Scott as "empower[ing] a district court to disregard testimony that is at odds with video evidence").

In fact, Scott's treatment of video evidence is frequently invoked in this Circuit and others as justification to dispose of civil rights cases on summary judgment. See, e.g., Kalfus v. Presbyterian Hosp., 476 Fed.Appx. 877, 880–81 (2d Cir. 2012) (summary order) (affirming dismissal of excessive force claim where video recording confirmed that "[n]o reasonable factfinder could conclude that [the officer's] actions were excessive in the circumstances"). Of course, there is often a good reason for this practice: relying on video evidence is common sense in cases where a video unambiguously reduces one party's version of events to little more than "visible fiction." Scott, 550 U.S. at 381, 127 S.Ct. 1769.

At the same time, however, Scott has brought about some hand-wringing in academic circles, with various commentators cautioning courts to resist the temptation to uncritically assume that video evidence inherently possesses a unique kind of "reliable factual conclusiveness." Naomi Mezey, The Image Cannot Speak for Itself: Film, Summary Judgment, & Visual Literacy, 48 Val. U. L. Rev. 1, 3 (2013); see also Denise K. Barry, Snap Judgment: Recognizing the Propriety & Pitfalls of Direct Judicial

---

**3.** While Hulett could certainly have attempted to bring such claim(s) against the City defendants, see Williams v. City of N.Y., 121 F.Supp.3d 354, 365–69 (S.D.N.Y. 2015), he does not appear to have actually done so, for reasons explained below.

Review of Audiovisual Evidence at Summary Judgment, 83 Fordham L. Rev. 3343, 3385 (2015) ("[T]he bottom line is that [ ] judicial review of audiovisual evidence is anything but the objective, neutral solution to divisive, fact-bound, and problematic cases that courts tout it to be."); Howard M. Wasserman, Video Evidence & Summary Judgment: The Procedure of Scott v. Harris, 91 Judicature 180, 182–83 (2008) (setting forth "three basic, related myths" associated with video evidence and cautioning that it cannot "transform[ ] the viewer into an eyewitness").[4]

Notably, in recent years district courts in this Circuit have made explicit what many of these commentators feared Scott's holding had at best left implicit: the mere existence of a videotape in the record depicting some or all of the events in dispute will not always be dispositive at the summary judgment stage.[5] Compare, e.g., Zachary v. City of Newburgh, 2016 WL 4030925, at *8 (S.D.N.Y. July 25, 2016) ("Although the video evidence casts significant doubt on plaintiff's version of the events in the strip search room, a reasonable juror could [still] credit plaintiff's account."), Rasin v. City of N.Y., 2016 WL 2596038, at *7 (E.D.N.Y. May 4, 2016) ("The parties have testified to two different stories, and the video evidence is not so conclusive as to determine this factual dispute as a matter of law."), and Mack v. Howard, 2014 WL 2708468, at *3 (W.D.N.Y. June 16, 2014) (declining to grant summary judgment where the "case boil[ed] down to two credible interpretations of the same video" (emphasis added)), with, e.g., Lin v. City of N.Y., 2016 WL 7439362, at *11 (S.D.N.Y. Dec. 21,

2016) ("[T]he video evidence unavoidably shows that the force used was constitutionally reasonable.").

Each of these decisions recognize the general principle that, in the ordinary case, the appropriate course of action is still to permit the jury an opportunity to "resolve the competing versions of events, in conjunction with the video, through the ordinary fact-finding processes in which juries engage: evaluating credibility, drawing inferences from everything they ha[ve] seen and heard, and deciding what all the evidence 'means' and what it reveals about what happened." Wasserman at 184 (emphasis added); see also Arthur R. Miller, Simplified Pleading, Meaningful Days in Court, & Trials on the Merits: Reflections on the Deformation of Federal Procedure, 88 N.Y.U. L. Rev. 286, 311 (2013) (observing that the summary judgment device has "taken on an Armageddon-like significance; it has become both the centerpiece and end-point for many (perhaps too many) federal civil cases").

■ In other words, while the video evidence submitted by the parties will certainly be considered and carefully reviewed at this juncture, Scott is best understood to permit the summary adjudication of a plaintiff's civil rights claim only in those exceptional cases where the video evidence in the record is sufficient to "blatantly contradict[ ]" one party's version of events. Scott, 550 U.S. at 380, 127 S.Ct. 1769.

With these threshold matters out of the way, what remains to be addressed are the merits of the pending motions.

4. At least one group of authors has taken up Scott's invitation to let the videotape "speak for itself," conducting an empirical analysis of how different social groups perceive the events depicted in that video. Dan M. Kahan et al., Whose Eyes Are You Going to Believe?

Scott v. Harris and the Perils of Cognitive Illiberalism, 122 Harv. L. Rev. 837 (2009).

5. Cautious treatment is especially warranted in cases where the video has a tendency to produce a visceral-but-subjective reaction in the viewer.

## B. The Centro defendants

Hulett contends the Centro defendants denied him bus service because of his disability in violation of the ADA and NYSHRL. Plaintiff also asserts Robinson is liable for medical indifference under 42 U.S.C. § 1983. To the extent plaintiff initially sought to bring additional claims against these particular defendants, his opposition briefing makes clear that he has abandoned them. Pl.'s Opp'n Mem. at 33 ("Hulett concedes that Centro is not liable for the actions of Wallace, Robinson, and Coleman under the doctrine of respondeat superior, that he has not established that Centro is liable under Monell, and that Wallace is not liable for deprivation of medical care.").[6]

### 1. Disability Discrimination

Hulett's ADA and NYSHRL claims will be analyzed in tandem. Rodal v. Anesthesia Grp. of Onondaga, P.C., 369 F.3d 113, 117 n.1 (2d Cir. 2004) ("New York State disability discrimination claims are governed by the same legal standards as federal ADA claims."); see also N.Y. Exec. Law § 296(2)(a) (making it unlawful for any "person, [including] the owner ... agent or employee of any place of public accommodation" to discriminate against the disabled); id. § 292(9) (defining "place of public accommodation" to include "all public conveyances operated on land ..., as well as the stations and terminals thereof").

In keeping with their general attitudes toward each other, the parties cannot agree on which Title of the ADA applies to Hulett's claim. The Centro defendants opened their briefing by focusing on Title III of the ADA, but as plaintiff points out, Centro's own informational documents refer to it as a "governmental entity," a

factor which suggests that Title II provides the more appropriate analytical framework. See Centro's Master Goal Plan for Fiscal Year 2015–2016, available at http://www.centro.org/docs/default-source/procurementdepartment/mwbe/program-fy-goals-mwbe-goal-plan-fy-2016.pdf (last visited May 8, 2017); see also, e.g., N.Y. Pub. Auth. Law § 1329 (declaring that Centro "shall be regarded as performing an essential governmental function"). In reply, the Centro defendants explain that they have "no objection to this Court applying Title II in determining the parties' summary judgment motions." Defs.' Reply Mem. at 21.

■■■ Generally speaking, both "Titles II and III of the ADA prohibit discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." Powell v. Nat'l Bd. of Med. Exam'rs, 364 F.3d 79, 85 (2d Cir. 2004) (citing Henrietta D. v. Bloomberg, 331 F.3d 261, 273 (2d Cir. 2003)).

Title II, Part B of the ADA "specifically governs the provision of public transportation services." Abrahams v. MTA Long Island Bus, 644 F.3d 110, 115 (2d Cir. 2011) (citing 42 U.S.C. §§ 12141–12165).

■■■ To state a claim under Title II, a plaintiff must establish: "(1) he is a qualified individual with a disability; (2) the defendant is subject to [the ADA]; and (3) he was denied the opportunity to participate in or benefit from the defendant's services, programs, or activities, or was otherwise discriminated against by defendants because of his disability." Disabled in Action v. Bd. of Elections in City of

---

**6.** Pagination corresponds to that assigned by CM/ECF, the Court's electronic docketing system.

N.Y., 752 F.3d 189, 196–97 (2d Cir. 2014) (quoting McElwee v. Cty. of Orange, 700 F.3d 635, 640 (2d Cir. 2012)).

Although "the scope of Title II is not limitless," Reeves v. Queen City Transp., Inc., 10 F.Supp.2d 1181, 1185 (D. Colo. 1998), "the phrase 'services, programs, or activities' has been interpreted to be a 'catch-all phrase that prohibits all discrimination by a public entity.' " Noel v. N.Y.C. Taxi & Limousine Comm'n, 687 F.3d 63, 68 (2d Cir. 2012) (quoting Innovative Health Sys., Inc. v. City of White Plains, 117 F.3d 37, 45 (2d Cir. 1997)).

The Centro defendants do not contest whether Hulett has stated a prima facie claim for disability discrimination under this framework. Rather, defendants contend plaintiff's federal and state law disability claims against them must be dismissed for two, independent reasons.

### i. Proximate Cause

■ First, the Centro defendants contend Hulett cannot demonstrate that they were the proximate cause of any of the injuries he ultimately sustained. According to defendants, the force employed by Officer Coleman and Sergeant Galvin was unexpectedly extreme and unforeseeable. To illustrate the difference, the Centro defendants at oral argument explained that, in their view, a "foreseeable" ADA violation in this case would be limited to, say, plaintiff suffering additional injury to his lower back as a result of being improperly forced to sit down rather than from any injury sustained as a result of the unexpectedly serious turn of events that actually occurred.

The Second Circuit has applied common law tort concepts to issues of proximate causation under the ADA. Henrietta D., 331 F.3d at 278–79 ("The common law of torts, however, instructs that the existence of additional factors causing an injury does not necessarily negate the fact that the defendant's wrong is also the legal cause of the injury.").

"The concept of proximate cause, or more appropriately legal cause, has proven to be an elusive one, incapable of being precisely defined to cover all situations." Derdiarian v. Felix Contracting Corp., 51 N.Y.2d 308, 314, 434 N.Y.S.2d 166, 414 N.E.2d 666 (N.Y. 1980) (citations omitted). As the Second Circuit observed almost two decades ago,

> In everyday terms, the concept might be explained as follows: Because the consequences of an act go endlessly forward in time and its causes stretch back to the dawn of human history, proximate cause is used essentially as a legal tool for limiting a wrongdoer's liability only to those harms that have a reasonable connection to his actions.

Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 235 (2d Cir. 1999).

■ Where, as here, "the acts of a third person intervene between the defendant's conduct and the plaintiff's injury, the causal connection is not automatically severed." Derdiarian, 51 N.Y.2d at 315, 434 N.Y.S.2d 166, 414 N.E.2d 666. Rather, "liability turns upon whether the intervening act is a normal or foreseeable consequence of the situation created by the defendant's [misconduct]." Id.; see also Kush v. City of Buffalo, 59 N.Y.2d 26, 33, 462 N.Y.S.2d 831, 449 N.E.2d 725 (N.Y. 1983) ("An intervening act will be deemed a superseding cause and will serve to relieve defendant of liability when the act is of such an extraordinary nature or so attenuates defendant's [initial conduct] from the ultimate injury that responsibility for the injury may not be reasonably attributed to the defendant.").

■ "There are certain instances, to be sure, where only one conclusion may be

drawn from the established facts and where the question of legal cause may be decided as a matter of law." Derdiarian, 51 N.Y.2d at 315, 434 N.Y.S.2d 166, 414 N.E.2d 666. However, "[b]ecause questions concerning what is foreseeable and what is normal may be the subject of varying inferences . . . , these issues generally are for the fact finder to resolve." Id.; see also Bell v. Bd. of Educ. of City of N.Y., 90 N.Y.2d 944, 946, 665 N.Y.S.2d 42, 687 N.E.2d 1325 (N.Y. 1997) ("While foreseeability is generally an issue for the fact finder, where only one conclusion can be drawn, proximate cause may be decided as a matter of law.").

The Centro defendants support their proximate causation argument by claiming ignorance about the possible consequences that might fairly flow from "merely" requesting the assistance of law enforcement with removing Hulett. In support of this claim, defendants have produced video evidence from 2010 depicting another instance in which Sup'r Robinson was involved in forcing plaintiff to leave a Centro bus.

This 2010 bus surveillance video depicts Hulett riding a Centro bus in a standing position for the duration of at least one stop before a female bus driver can be heard telling him to sit down because, in her words, "you always gettin' up [and] you barely can walk." Hunt Aff. Ex. W (traditionally filed with the Court). When plaintiff refuses, the driver is shown stopping the bus before telling him that: "you have a disability you gotta sit." Id. When plaintiff is again heard to refuse, the driver summons Sup'r Robinson to the scene, where he initially attempts to convince plaintiff to sit down. Id. When plaintiff refuses yet again, Sup'r Robinson calls in a pair of SPD officers, who remove plaintiff's grip on the bus's grab bar and escort him outside. Id.

The Centro defendants contend that a review of this prior incident conclusively defeats Hulett's claim. According to Sup'r Robinson, because plaintiff "peacefully complied" with the SPD officers on this past occasion, defendants cannot in any way be held responsible for the violent, aggressive course of action undertaken by Officer Coleman and Sergeant Galvin this time around. Robinson Aff. ¶ 8.

To make this point, the Centro defendants rely principally on Estate of Saylor v. Regal Cinemas, Inc., 54 F.Supp.3d 409 (D. Md. 2014), a case from Maryland with a tragic fact pattern. There, off-duty Sheriff's Office deputies working mall security caused the death of an individual with Down Syndrome after a movie theater employee asked the deputies to remove the decedent from the theater for failing to pay for a movie ticket. Id. at 412–14.

As relevant here, the Saylor Court granted the defendant-theater's motion to dismiss, concluding that a mere request by the theater's employee to remove the decedent could not, as a matter of law, be considered a proximate cause of decedent's death. Estate of Saylor, 54 F.Supp.3d at 429. Although the Court acknowledged it was "painfully aware that law enforcement officers do, at times, employ excessive and deadly force," it nevertheless concluded it would be inappropriate to task ordinary citizens with the responsibility to "anticipate that possibility when simply requesting the assistance of the police." Id. at 433.

This argument is rejected. While the Centro defendants are correct to characterize the bus incident as one that does not fall neatly inside the typical rubric used to evaluate a denial-of-services claim, the particular circumstances of this case warrant a different conclusion, at least at the summary judgment stage.

For starters, Saylor is not the silver bullet the Centro defendants are looking

for here, since it is an out-of-Circuit district court decision whose reasoning does not bind this Court or any other. See, e.g., Camreta v. Greene, 563 U.S. 692, 709 n.7, 131 S.Ct. 2020, 179 L.Ed.2d 1118 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

Even assuming otherwise, a close reading of the Saylor Court's proximate cause discussion reveals that it is directed at whether, and when, a violation of the ADA can stand as some relevant evidence in support of a negligence claim under Maryland state law. See Estate of Saylor, 54 F.Supp.3d at 431.

Answering that question in the negative, the Saylor Court concluded that even accepting "that a violation of the ADA could be used as evidence of negligence, ... the Court would, nonetheless, conclude that the claim would fail because [the theater's] conduct was not the proximate cause" of decedent's death. 54 F.Supp.3d at 431. In other words, the Saylor Court's view of the limits of proximate causation under Maryland state law defeated decedent's state law negligence claim, a different issue than the one raised here. See id. at 431–32.

More importantly, a review of the 2010 video submitted by the Centro defendants reveals that although this prior incident did not result in a tasing or a broken hip, Hulett's compliance on that occasion most certainly appears to have been procured in a less-than-totally-peaceful manner—at the very least, plaintiff's hand appears to have been forcibly removed from the grab bar by one of the SPD officers, and plaintiff can be heard arguing loudly with the officers as they forcefully escort him off the bus.

A factfinder might well conclude, based partially on Sup'r Robinson's direct involvement in this earlier incident, that he was on notice that SPD officers would readily use *some* degree of force to remove Hulett in the event they were summoned to do so. Indeed, a jury might also infer from this earlier incident that it was more widely understood by Centro bus drivers and their supervisors that they could mistreat disabled passengers who inconvenienced them, in contravention of their own stated policies, by using uniformed law enforcement to forcibly remove them in the absence of legitimate justification.[7]

A factfinder might conclude one or more of these inferences are especially warranted under the circumstances of this case, where the audio transcript of the later, 2013 incident reveals that Sup'r Robinson actually gave Officer Coleman a specific direction rather than just a call for general assistance: "[s]ee if you can't have him have a seat or your [*sic*] gonna have to take him off [the bus]." Among other things, a jury could determine that a specific direction like that one, aimed at an intransigent passenger whose visibly indented skull, noticeably altered speech pattern, and clearly limited left-handed function suggest he may be particularly susceptible to physical force, might well result in foreseeable injury during his forcible removal. In sum, none of the Centro defendants' proximate cause arguments provide a basis for the dismissal of Hu-

---

7. Sup'r Robinson readily acknowledged at his deposition that passengers are regularly permitted to ride Centro buses while standing, so long as they stay behind the white or yellow line near the front of the bus. In fact, Supr' Robinson stated that if plaintiff had just explained why he refused to sit down, he "would've just had the operator fill out an incident report stating why [he refused] ..., notified dispatch that [they] have an unsafe passenger on board, but we're still going to transport him and if anything happens, it's already recorded on camera ... but we are going to transport him."

lett's disability discrimination claims as a matter of law.

### ii. The Direct Threat Doctrine

In the alternative, the Centro defendants contend they are not liable under the ADA "because Hulett's refusal to sit constituted a direct threat to the safety of other passengers on the bus." Plaintiff responds that this "safety" justification is a catch-all response that conceals the true rationale(s) for bus driver Wallace and Sup'r Robinson's actions, which were based either in the best case on mistaken preconceptions about the limited abilities of disabled people or, at worst, on intentional animus.

The "direct threat" doctrine operates as an affirmative defense to a disability discrimination claim under the ADA, 49 C.F.R. §§ 37.1, 37.5(h), and is defined as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services," 42 U.S.C. § 12182(b)(3).

 However, "[t]o constitute a 'direct threat,' the probability of significant harm must be substantial, constituting more than a remote or slightly increased risk." Doe v. Deer Mountain Day Camp, Inc., 682 F.Supp.2d 324, 345 (S.D.N.Y. 2010) (citations omitted). In making a direct threat determination, a public accommodation must

> make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures will mitigate the risk.

Deer Mountain Day Camp, Inc., 682 F.Supp.2d at 346 (emphasis and citation omitted).

According to the Centro defendants, bus driver Wallace observed Hulett's unsteady gait as he boarded the bus and concluded plaintiff might fall if permitted to ride while standing. Thus, plaintiff's "refusal to sit constituted a direct threat to the safety of other passengers on the bus."

 This argument is also rejected at this stage. To be sure, the Centro defendants correctly assert that it is the *reasonableness* of their employee's decision made in the moment, not the ultimate *correctness* of it after the fact, that matters in evaluating whether someone posed a "direct threat" as the ADA defines the term. See Makinen v. City of N.Y., 53 F.Supp.3d 676, 697–98 (S.D.N.Y. 2014) ("The focal point, in other words, is the *ex ante* reasonableness of a defendant's determination, not an *ex post* determination of its accuracy by the factfinder.").

 But at the end of the day, "the entity asserting a 'direct threat' as a basis for excluding an individual bears the heavy burden of demonstrating that the individual poses a significant risk to the health and safety of others." Lockett v. Catalina Channel Exp., Inc., 496 F.3d 1061, 1066 (9th Cir. 2007). As Hulett contends, merely stating that "had plaintiff fallen while the bus was moving, he could have injured himself or other passengers," as the Centro defendants do here, proves absolutely nothing, since *every* passenger who might choose to stand on a Centro bus (as Centro's own regulations permit passengers to do) poses an identical safety hazard. 28 C.F.R. § 36.301 ("Safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities.").

Indeed, others courts have taken pains to emphasize that "a direct threat is not lightly found." Monroe v. Cty. of Orange, 2016 WL 5394745, at *16 (S.D.N.Y. Sept. 27, 2016). And the U.S. Department of Transportation's own Federal Transit Administration has issued guidance on this issue confirming that

> An agency cannot deny service to a person with a disability based on what it perceives to be "safe" or "unsafe" for that individual. All riders take on some level of risk when traveling (e.g., standing while riding a bus, crossing busy streets, or walking along roadways with quickly moving traffic). Individuals with disabilities also have the right to decide the level of risk they are willing to take to travel independently."

U.S. Dep't of Transp., Fed. Transit Admin., Guidance Circular on Civil Rights, 2015 WL 6037995 (Nov. 4, 2015).

Notably, Hulett's assertion that he has *never* fallen while standing on a Centro bus remains uncontroverted at this point. Further, plaintiff's testimony suggests that other Centro bus drivers regularly permitted him to ride while standing over the three-year period between his serious bicycle accident and the events at issue here. Indeed, even the 2010 incident itself tends to confirm that Sup'r Robinson, at least, was aware of the fact that plaintiff had been riding public buses in this manner on some occasions.

 If nothing else, a reasonable jury could well conclude the risk of harm posed by the mere possibility Hulett might fall down simply did not meet the "high threshold baked into the direct-threat analysis." Monroe, 2016 WL 5394745, at *17. That is especially so here, since a review of the audio transcript from the 2013 incident suggests that the "safety-related" justification raised by bus driver Wallace and Sup'r Robinson reflects, at best, generalized concerns about the mere

fact of plaintiff's disability as opposed to any individualized assessment and accompanying conclusion about a "significant risk to the health and safety of others" posed by plaintiff in particular. See, e.g., Van Vleck Decl. Ex. 2 at 9 (audio transcript of bus driver Wallace explaining to other passengers that he "really (ui) for the young man to sit down 'cause he has a disability").

It bears repeating that Sup'r Robinson testified at his deposition that Hulett was not obstructing access to, or the movement of any passengers on, the bus at the time of the incident. Sup'r Robinson also readily acknowledged that passengers are permitted to ride while standing behind the white or yellow line. And again, Sup'r Robinson stated that if plaintiff had just explained why he refused to sit down, he "would've just had the operator fill out an incident report stating why [he refused] ..., notified dispatch that [they] have an unsafe passenger on board, but we're still going to transport him and if anything happens, it's already recorded on camera ... but we are going to transport him."

In essence, the parties dispute the basis for, and reasonableness of, bus driver Wallace's initial demand and, when Hulett refused to comply, the reasonableness of his and Sup'r Robinson's choice to escalate the situation. Because the "direct threat" doctrine is an affirmative defense to plaintiff's claims, it simply does not necessitate their dismissal as a matter of law at this juncture.

## 2. The § 1983 Medical Indifference Claim against Sup'r Robinson

Hulett's § 1983 medical indifference claim against Sup'r Robinson is based on the fact plaintiff was allegedly suffering from a broken hip during the time period between his forcible removal from the bus and his later transfer to the Justice Cen-

ter. According to plaintiff, Robinson was "supervising" Officer Coleman in his capacity as private security for Centro during this period. Plaintiff supports this claim principally by pointing to the portion of the bus surveillance video that shows Sup'r Robinson exit the bus and remain in the general area following plaintiff's detention.

"The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." Wyatt v. Cole, 504 U.S. 158, 161, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992). However, "[s]ection 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." Sykes v. James, 13 F.3d 515, 519 (2d Cir.1993). Thus, a § 1983 claim requires a plaintiff to show (1) the deprivation of a right, privilege, or immunity secured by the Constitution and its laws by (2) a person acting under the color of state law. 42 U.S.C. § 1983.

Historically, a § 1983 claim alleging deliberate indifference to a plaintiff's serious medical needs has been analyzed under a two-pronged standard. See V.W. by & through Willams v. Conway, 236 F.Supp.3d 554, 582-83, 2017 WL 696808, at *18 (N.D.N.Y. Feb. 22, 2017). The first prong of this standard was objective: "the alleged deprivation of adequate medical care must be sufficiently serious." Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 139 (2d Cir. 2013) (citation and internal quotation marks omitted). The second prong was long understood to be subjective: "the charged officials must be subjectively reckless in their denial of medical care." Id.

Under this well-settled approach, it made no difference whether the plaintiff was a convicted prisoner or a pre-trial detainee, since the Second Circuit had repeatedly instructed lower courts that "[c]laims for deliberate indifference to a . . . serious threat to the health or safety of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment." Caiozzo v. Koreman, 581 F.3d 63, 72 (2d Cir. 2009).

Recently, however, the Second Circuit has changed course. In Darnell v. Pineiro, 849 F.3d 17 (2d Cir. 2017), the Court overruled in part Caiozzo, observing that the "subjective prong" of a § 1983 deliberate indifference claim asserted by a pre-trial detainee is "perhaps better classified as a 'mens rea prong' or 'mental element prong.'" Id. at 29. Accordingly, the Court concluded that "deliberate indifference" in the Fourteenth Amendment context should be "defined objectively," meaning that the "Due Process Clause can be violated [even] when an official does not have subjective awareness that the officials acts (or omissions) have subjected the pre-trial detainee to a substantial risk of harm." Id. at 35. In other words, rather than ask whether the defendant "kn[ew] of and disregard[ed] an excessive risk to [ ] health or safety," the appropriate inquiry under the Fourteenth Amendment is whether the defendant "knew, or should have known" that his conduct "posed an excessive risk to health or safety." Id. at 33, 35.

After carefully considering the parties' briefing in light of this standard, the § 1983 claim against Sup'r Robinson will be dismissed. Centro is a public benefit corporation, N.Y. PUB. AUTH. LAW § 1328(a), and is therefore considered a municipal entity for purposes of § 1983. See Byrd v. Metro. Transit Auth., 2015 WL 4546718, at *2 (E.D.N.Y. July 28, 2015) ("Public benefit corporations, such as

the MTA, are municipal entities for the purpose of Section 1983.").

 It would therefore follow that Sup'r Robinson, a Centro employee, acted "under color of state law" during the incident. Cf. Louis v. Metro. Transit Auth., 145 F.Supp.3d 215, 223 (E.D.N.Y. 2015) (concluding public bus driver acted under color of state law for purposes of § 1983 when he ejected passenger with police assistance); see also Hollander v. Copacabana Nightclub, 624 F.3d 30, 33 (2d Cir. 2010) (holding that state action occurs when, *inter alia*, the party charged with the deprivation is "a person who may fairly be said to be a state actor").

 But both parties' accounts of events, considered in conjunction with the surveillance video, confirm that by the time Sup'r Robinson finally exited bus 1249 to observe the aftermath of Hulett's removal, SPD had taken control over the area by calling in additional officers as well as an ambulance. Importantly, even though plaintiff contends the Rural/Metro defendants were medically negligent and/or constitutionally indifferent to his needs, there is no factual dispute over whether Paramedic Maule and EMT Dreverman actually arrived in response to that call for assistance.

Therefore, under either version of the facts, no reasonable jury could conclude that it was *constitutionally* unreasonable for Sup'r Robinson, at that point, to stand by and/or defer to the on-scene police and medical professionals. Simply put, plaintiff cannot demonstrate that, under these circumstances, Sup'r Robinson "knew, or should have known" that his failure to take additional action under those particular circumstances "posed an excessive risk" to plaintiff's immediate health or safety. Dar-

nell, 849 F.3d at 35. Accordingly, the § 1983 medical indifference claim against Sup'r Robinson will be dismissed.

### 3. Officer Coleman's Employment Status

In his opposition to the Centro defendants' motion, Hulett contends there is a legitimate dispute regarding whether Officer Coleman was acting as a Centro employee or as an SPD officer during the incident. According to plaintiff, this dispute precludes the dismissal of his false arrest and malicious prosecution claims against Centro.

 However, as the Centro defendants point out in their reply, Hulett's earlier concessions obviate the need to discuss this issue in any sort of detail. To the extent plaintiff believes this dispute to be relevant for purposes of his § 1983-based false arrest or malicious prosecution claims against Officer Coleman in his individual capacity, plaintiff is simply incorrect: a successful § 1983 individual-capacity claim against an official can result only in a finding of liability against the official himself.[8] While that official's employment status might then prove relevant to him or to his employer(s) for purposes of reimbursement or indemnification, it is not relevant to the § 1983 claim itself.

And while Officer Coleman's disputed employment status might have proven relevant for purposes of analyzing a *respondeat superior* claim against Centro based on false arrest or malicious prosecution under state law or possibly for a Monell claim under 42 U.S.C. § 1983, Hulett has specifically abandoned those theories of relief. Pl.'s Opp'n Mem. at 33 ("Hulett concedes that Centro is not liable for the

---

**8.** As explained later in this opinion, any official-capacity claim against Officer Coleman is

redundant of a claim against the City.

actions of Wallace, Robinson, and Coleman under the doctrine of respondeat superior, that he has not established that Centro is liable under Monell, and that Wallace is not liable for deprivation of medical care."). Accordingly, there is no apparent need to resolve this dispute.

## C. The City defendants

Hulett asserts § 1983 and related state law claims against Officer Coleman and Sergeant Galvin for excessive force, false arrest and imprisonment, and malicious prosecution. Plaintiff also asserts a § 1983 claim against the City for systematically failing to appropriately train, supervise, and discipline officers, resulting in the use of excessive force against citizens with disabilities. Finally, plaintiff asserts that the City is liable for its employees' misconduct under a state law theory of *respondeat superior.*

### 1. Excessive Force & Assault and Battery

■■■ "The Fourth Amendment prohibits the use of unreasonable and therefore excessive force by a police officer in the course of effecting an arrest." Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010). "Federal excessive force claims and state law assault and battery claims against police officers are nearly identical." Graham v. City of N.Y., 928 F.Supp.2d 610, 624 (E.D.N.Y. 2013).[9]

■■■ For either type of claim to succeed, a plaintiff must ultimately demonstrate that the defendant's use of force was "objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.'" Hershey v. Gold-

stein, 938 F.Supp.2d 491, 519 (S.D.N.Y. 2013) (quoting Maxwell v. City of N.Y., 380 F.3d 106, 108 (2d Cir. 2004)). "If the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." Id. (quoting Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987)).

■■■ This "objective reasonableness" inquiry is "necessarily case and fact specific and requires balancing the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests against the countervailing governmental interests at stake." Tracy, 623 F.3d at 96 (citing Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 123 (2d Cir. 2004).

■■■ Thus, review is "guided by consideration of at least three factors: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Tracy, 623 F.3d at 96 (citing Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)).

■■■ Importantly, a court must evaluate the record " 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " Tracy, 623 F.3d at 96 (quoting Jones v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006)). In so doing, it is important to "make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the

---

9. If anything, state law "assault and battery claims are more plaintiff friendly, because under New York law '[i]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and bat-

tery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest.' " Graham, 928 F.Supp.2d at 624 (quoting 5 Borough Pawn, LLC v. Marti, 753 F.Supp.2d 186, 201 (S.D.N.Y. 2010)).

amount of force that is necessary in a particular situation.' " Id.

■ "Accordingly, police receive a fairly wide zone of protection in close cases involving potential danger, emergency conditions, and other exigent circumstances." Lin v. Cty. of Monroe, 66 F.Supp.3d 341, 358 (W.D.N.Y. 2014) (citation omitted). However, "granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." Amnesty Am., 361 F.3d at 123.

■ With the contours of this standard firmly in mind, the parties' cross-motions on these claims are denied. Defendants, for their part, try to paint the incident on the bus as a rapidly evolving situation that required quick-thinking by Officer Coleman and Sergeant Galvin, but the bus surveillance video as well as the officers' own testimony tends to undermine that characterization of the circumstances. Greenaway v. Cty. of Nassau, 97 F.Supp.3d 225, 235 (E.D.N.Y. 2015) ("Because objective reasonableness is extremely fact-specific, summary judgment on the issue is often inappropriate.").[10]

Among other things, at the time of the incident the bus was still parked in the Centro hub, meaning it was not, for example, parked on the side of a busy city street, a situation that might militate in favor of the conclusion that the situation needed to be resolved quickly for safety purposes. Further, although Sergeant Galvin at his deposition appeared reluctant to concede that plaintiff's appearance, demeanor, and speech would permit the average person to readily conclude plaintiff suffered from one or more serious disabilities, Galvin Dep. at 144 ("I was aware of the ... possibility existed, he may have an infirmity"), a review of the bus surveillance video clearly suggests otherwise.

In addition, neither the alleged conduct justifying the initial intervention—causing a delay to bus driver Wallace's route—nor the primary alleged crime identified by the City defendants as resulting from that conduct—disorderly conduct—can fairly be described as "serious." Indeed, disorderly conduct is considered only a "violation" under state law, N.Y. PENAL LAW § 240.20, and is therefore an offense for which no greater than fifteen days' imprisonment may be imposed, id. § 10.00(3).

Importantly, upon Sergeant Galvin's arrival, the two officers together almost immediately chose to employ a taser, an indisputably significant use of force, on Hulett, who is visibly physically disabled. See Garcia v. Dutchess Cty., 43 F.Supp.3d 281, 297 (S.D.N.Y. 2014) ("[B]oth methods of deploying a taser constitute 'significant' force."); see also Estate of Armstrong ex rel. Armstrong v. Vill. of Pinehurst, 810 F.3d 892, 911 (4th Cir. 2016) ("Taser use is severe and injurious regardless of the mode to which the taser is set.").

■ To be sure, and as the City defendants insist, the law does not make it "presumptively unreasonable or excessive" to use a taser against a physically disabled person. Gordon v. Cty. of Onondaga, 2014 WL 6078426, at *6 (N.D.N.Y. Nov. 13, 2014) (Scullin, J.). Yet to do so under the

---

10. The Greenaway plaintiff, who suffered from bipolar disorder, was tased multiple times by police and dragged from his home after his mother called 911 seeking general assistance. 97 F.Supp.3d at 229–231. There, the Court denied summary judgment principally because of a material factual dispute between the parties regarding whether plaintiff had been violent or aggressive toward the responding officers. Id. at 233–37; see also Jason Grant, Federal Jury Awards $8M to Man Injured by Police Stun Gun, NEW YORK LAW JOURNAL, May 25, 2017.

apparent circumstances of this case, where Hulett offered only verbal refusals to comply and a continued grip on the bus's grab bar with his good right hand, weighs decidedly against any conclusion that plaintiff could be viewed as a flight risk or as an immediate threat to the officers or nearby passengers. See Crowell v. Kirkpatrick, 400 Fed.Appx. 592, 595 (2d Cir. 2010) (summary order) (specifically declining ·to "suggest that the use of a taser to effect an arrest is always, *or even often,* objectively reasonable" (emphasis added)); Lee v. City of Utica, 2013 WL 12140336, at *4 (N.D.N.Y. Mar. 5, 2013) (collecting cases on reasonable and unreasonable use of tasers); see also Vill. of Pinehurst, 810 F.3d at 909 ("The subject of a seizure does not create [a safety] risk simply because he is doing something that can be characterized as resistance—even when that resistance includes physically preventing an officer's manipulations of his body.").

In addition, the black-and-white bus surveillance video fails to clearly show what occurred as the officers forcefully "escorted" Hulett off the bus, and leaves the viewer wondering whether, and to what extent, additional force may have been applied during those moments that might have contributed to plaintiff's broken hip. And even following plaintiff's removal from the bus, it cannot be said as a matter of law that Sergeant Galvin acted in an objectively reasonable manner by dragging plaintiff some distance across the pavement, since plaintiff did not appear to be offering any further resistance at that point. Tracy, 623 F.3d at 98 (holding that otherwise acceptable use of pepper spray became excessive when arrestee was "offering no further active resistance"); Meyes v. Baltimore Cnty., 713 F.3d 723, 733 (4th Cir. 2013) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated."). In fact, plaintiff's testimony and the video

both suggest that by that point in the encounter plaintiff had been rendered unable to comply with any further commands. Beaver v. City of Fed. Way, 507 F.Supp.2d 1137, 1146 (W.D. Wash. 2007) ("[D]efendants confuse involuntary noncompliance with active resistance.").

The City defendants' bid for qualified immunity on these claims is also denied at this juncture. "[A] decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'" Coollick v. Hughes, 699 F.3d 211, 219 (2d Cir. 2012) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)).

Importantly, however, "[s]ince the law in this area is well-established, 'in Fourth Amendment unreasonable force cases, unlike in other cases, the qualified immunity inquiry is the same as the inquiry made on the merits.'" Washpon v. Parr, 561 F.Supp.2d 394, 408 (S.D.N.Y. 2008) (quoting O'Bert ex rel. Estate of O'Bert v. Vargo, 331 F.3d 29, 37 (2d Cir. 2003)); see also Garcia, 43 F.Supp.3d at 297 ("[D]ecisions involving tasers from at least four other federal courts of appeals make pellucid that the contours of the constitutional right at issue here were indeed clearly established by March 2010.").

And although in some cases an officer may nevertheless still be shielded by qualified immunity if his conduct "falls in the sometimes hazy border between excessive and acceptable force," that concern is not implicated here. Hartman v. Cty. of Nassau, 350 Fed.Appx. 477, 479 (2d Cir. 2009) (summary order) (citation and internal quotation marks omitted); see also Franks

v. New Rochelle Police Dep't, 2015 WL 4922906, at *16 (S.D.N.Y. Aug. 18, 2015) (declining to resolve qualified immunity issue on summary judgment where "the Court [was] unable to determine whether [defendant's] actions were objectively reasonable in light of the legal rules that were clearly established at the time [they were] taken"). Accordingly, plaintiff's § 1983 excessive force and state law assault and battery claims will remain for trial.

### 2. False Arrest and Imprisonment

 Claims for "false arrest" and "false imprisonment" are "synonymous" under New York law, and both are "substantially the same" as a § 1983 claim for false arrest. Jackson v. City of N.Y., 939 F.Supp.2d 235, 248 (E.D.N.Y. 2013). "Under New York law, an action for false arrest requires that the plaintiff show that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." Ackerson v. City of White Plains, 702 F.3d 15, 19 (2d Cir. 2012).

 "To avoid liability for a claim of false arrest, an arresting officer may demonstrate that either (1) he had probable cause for the arrest, or (2) he is protected from liability because he has qualified immunity." Simpson v. City of N.Y., 793 F.3d 259, 265 (2d Cir. 2015). "A police officer has probable cause to arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.'" Jackson, 939 F.Supp.2d at 249 (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)).

 "The test for probable cause is an objective one and 'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" Yorzinski v. City of N.Y., 175 F.Supp.3d 69, 75 (S.D.N.Y. 2016) (quoting Zellner v. Summerlin, 494 F.3d 344, 369 (2d Cir. 2007)). "An arresting officer thus does not have a 'duty ... to investigate exculpatory defenses offered by the person being arrested or to assess the credibility of unverified claims of justification before making an arrest." Id. at 76 (quoting Jocks v. Tavernier, 316 F.3d 128, 135–36 (2d Cir. 2003)). "At the same time, however, the Second Circuit has recognized that 'the failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.'" Id. (quoting Manganiello v. City of N.Y., 612 F.3d 149, 161 (2d Cir. 2010)).

The City defendants contend probable cause existed to arrest Hulett for disorderly conduct and resisting arrest because plaintiff's refusal to sit down "resulted in a delay to Wallace's bus route." As relevant here, "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof ... [h]e obstructs vehicular or pedestrian traffic." N.Y. Penal Law § 240.20(5).

 "New York courts have interpreted this statute to permit punishment only where the conduct at issue does more than merely inconvenience pedestrian or vehicular traffic." Jones, 465 F.3d at 59. And as indicated by the statutory text, the offense also "requires that an individual intentionally create the public disturbance or at least do so recklessly." Milfort v. Prevete, 3 F.Supp.3d 14, 21 (E.D.N.Y. 2014) ("Milfort II").

 Against this backdrop, the parties' cross-motions on these claims will also be denied. After reviewing the bus surveillance video several times in conjunction with the audio transcript and the parties'

supporting testimony as to the relevant timeline of events, it simply cannot be said, as a matter of law, that no reasonable factfinder could draw the set of conclusions necessary to find in either Hulett's or the City defendants' favor.

■■■ To begin with, "[t]he issue of precisely when an arrest takes place is a question of fact." Jackson, 939 F.Supp.2d at 249 (citation omitted); Brendlin v. California, 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007) ("A person is seized by the police ... when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied.").

In this case, there is a threshold dispute about what, if any, information Centro employees shared with Officer Coleman before he initially became involved, since although Officer Coleman testified that Sup'r Robinson asked him for assistance with dealing with a passenger on bus 1249, Sup'r Robinson himself denies ever doing so. Compare Robinson Dep. at 24, with Coleman Dep. at 90.

Officer Coleman and Hulett then appear to engage in a brief, but inconclusive, back-and-forth about sending plaintiff "to jail for standing on the bus" before Sergeant Galvin arrives, and the audio transcript confirms that Sergeant Galvin does not actually utter the words "you're under arrest" until 12:22:50 p.m., some time after plaintiff has been already been tased and ejected from the bus.

Of course, for purposes of § 1983 those words are not dispositive as to the moment of arrest. But under the particular circumstances of this case, it is hard to say exactly when the average person in Hulett's shoes would have felt his freedom of movement was restrained, since plaintiff at all times maintained a right-handed grip on the grab bar with no apparent intention to do anything other than take a trip on the bus. And this lack of clarity renders it difficult to determine the point from which the probable cause calculus should be measured.

Further, a review of the audio transcript tends to undermine any conclusion that either officer could reasonably have determined that Hulett's inaction was undertaken with intent to cause, or recklessly create a risk of, public inconvenience, annoyance, or alarm, or, for that matter, that plaintiff intended to cause any obstruction at all. Indeed, Sup'r Robinson testified at his deposition that plaintiff's location was clearly not obstructing access to, or the movement of any passengers on, the bus at the time of the incident. Cf. Milfort, 3 F.Supp.3d at 22 (declining to find officer's decision to conduct disorderly conduct arrest reasonable where jury credited evidence that "Plaintiff was not actually blocking the flow of traffic" and that eventual disturbance giving rise to probable cause "was at least partially provoked by Defendant's own actions").

Therefore, although grainy, black-and-white video of much of the incident exists, a jury will still need to make some specific findings before a determination can be made as to the objective reasonableness of the arrest under the circumstances. Smith v. Cty. of Nassau, 2015 WL 1507767, at *11 (E.D.N.Y. Mar. 31, 2015) ("The question is whether the facts known to the arresting officer, at the time of the arrest, objectively provided probable cause to support the arrest."), aff'd, 643 Fed.Appx. 28 (2d Cir. 2016) (summary order).

These factual uncertainties also preclude the grant of qualified immunity at this juncture. See Milfort v. Prevete, 922 F.Supp.2d 398, 407 (E.D.N.Y. 2013) ("Milfort I") ("Defendants are not entitled to qualified immunity on a motion for summary judgment if any reasonable trier of

fact could find that the defendants' actions were objectively unreasonable.").

■ The City defendants also identify New York's resisting arrest statute in their moving papers. A person is guilty of resisting arrest "when he intentionally prevents or attempts to prevent a police officer ... from effecting an *authorized* arrest of himself or another person." N.Y. PENAL LAW § 205.30 (emphasis added). But because there is a genuine dispute regarding whether the arrest was authorized at its inception (and what that point may have been), it cannot be said as a matter of law that Hulett's arrest was *authorized* at the time he resisted it. See, e.g., Jackson, 939 F.Supp.2d at 252; see also W illiam C. Donnino, Practice Commentary to N.Y. Penal Law § 205.30, ("[A] person who physically resists an unauthorized arrest is not guilty of 'resisting arrest,' though such person may be guilty of 'assault.' ").

■ Finally, the City defendants in their reply memorandum identify two additional bases for arrest—criminal trespass and obstructing governmental administration in the second degree. However, although the issue of "[w]hether probable cause existed for the charge actually invoked by the arresting officer at the time of arrest is irrelevant .... [because a defendant can] prevail if there was probable cause to arrest [p]laintiff for any single offense," Ackerson, 702 F.3d at 20, "[i]t is well settled that a district court is free to disregard argument[s] raised for the first time in reply papers." Kenney v. Clay, 172 F.Supp.3d 628, 639 (N.D.N.Y. 2016). Accordingly, plaintiff's false arrest and false imprisonment claims will remain for trial.

### 3. Malicious Prosecution

■ "Claims of malicious prosecution arising under Section 1983 are gov-

erned by the same standard applied under state law." Frederique v. Cty. of Nassau, 168 F.Supp.3d 455, 477 (E.D.N.Y. 2016) (citing Russell v. Smith, 68 F.3d 33, 36 (2d Cir. 1995)). To prevail on a claim of malicious prosecution, a plaintiff must establish: (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice. Savino v. City of N.Y., 331 F.3d 63, 72 (2d Cir. 2003). In addition, a § 1983 malicious prosecution claim requires that "there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." Washington v. Cty. of Rockland, 373 F.3d 310, 316 (2d Cir. 2004).

■ The parties' cross-motions as to these claims are also denied. In particular, the parties raise arguments as to whether Hulett can satisfy the second, third, and fourth elements of these claims.[11] With respect to the "favorable termination" element, the City defendants, citing Lynch v. Suffolk Cty. Police Dep't, Inc., 348 Fed. Appx. 672 (2d Cir. 2009) (summary order), contend that dismissals based on legal insufficiency and / or in the interest of justice cannot satisfy this element as a matter of law.

■ That argument is rejected. First, there is no *per se* rule that a dismissal in the "interest of justice" does not constitute a favorable termination. See, e.g., Norton v. Town of Brookhaven, 47 F.Supp.3d 152, 160–61 (E.D.N.Y. 2014) (discussing New York law on this issue). Rather, as the New York Court of Appeals has explained, "the question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused." Cantalino v. Danner, 96 N.Y.2d

---

**11.** In their reply briefing, the City defendants raise an additional argument as to whether Hulett has satisfied fifth element. Because it was raised for the first time in reply, it will not be considered here.

391, 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (N.Y. 2001); see also Arum v. Miller, 273 F.Supp.2d 229, 234 (E.D.N.Y. 2003) (explaining that an "interest of justice" dismissal under circumstances suggesting it was out of mercy would not suffice because "mercy presupposes the guilt of the accused"). The same holds true for dismissals based on legal insufficiency. Cf. Lozada v. Weilminster, 92 F.Supp.3d 76, 96 (E.D.N.Y. 2015) ("Dismissals based on legal insufficiency *generally* do not satisfy the favorable termination element." (emphasis added)).

Here, however, the record of the state court proceeding arguably reflects a "formal abandonment of the charges" attributable to the prosecuting authority itself. In this case, the District Attorney's office made a number of statements impugning the facial validity of the criminal charges before joining in Hulett's dismissal motion. Under those circumstances, the dismissal in this case was not simply an independent determination solely attributable to the trial court. Cf. Lozada, 92 F.Supp.3d at 97 n.14 (granting summary judgment on malicious prosecution claim where "there is no act or action on the part of the government to similarly support the conclusion that the charges against Plaintiff were formally and finally abandoned").

▉▉▉A reasonable jury could also find the "lack of probable cause" element to be satisfied. "Probable cause in the context of a malicious prosecution claim requires knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." Penree v. City of Utica, N.Y., 2016 WL 915252, at *29 (N.D.N.Y. Mar. 4, 2016) (D'Agostino, J.). Because the City defendants simply refer to their earlier probable cause arguments, they are rejected at this juncture for the same reasons already discussed.

▉▉ Finally, a jury could also find that the "malice" element has been satisfied. In this context, "[m]alice does not require actual spite or hatred, but rather means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" Arum, 273 F.Supp.2d at 235 (quoting Lowth v. Town of Cheektowaga, 82 F.3d 563, 572 (2d Cir. 1996)).

▉▉ Importantly for present purposes, malice may be inferred from a lack of probable cause. Therefore, a live factual dispute over the issue of probable cause, like the one in this case, will preclude a summary determination on the issue of malice as well. See, e.g., Weiner v. McKeefery, 90 F.Supp.3d 17, 38 (E.D.N.Y. 2015) ("Here, because the existence of probable cause to prosecute remains in question, the existence of actual malice does as well."); Noga v. City of Schenectady, 169 F.Supp.2d 83, 90 (N.D.N.Y. 2001) (Homer, M.J.) ("Thus, if there is question of fact for probable cause, there is also a question for malice."). Accordingly, plaintiff's malicious prosecution claims remain for trial.

### 4. Medical Indifference

▉▉▉ As discussed above, a § 1983 claim alleging deliberate indifference to a plaintiff's serious medical needs is analyzed under a two-pronged standard. See Conway, 236 F.Supp.3d at 582-83. Where, as here, the plaintiff is being detained pretrial, both prongs of this test are defined "objectively," see Darnell, 849 F.3d at 35, with the first prong requiring a plaintiff to show that "the alleged deprivation of adequate medical care [was] sufficiently serious," Spavone, 719 F.3d at 139, and the second prong requiring a plaintiff to show that the defendant "knew, or should have known" that the deprivation "posed an ex-

cessive risk to health or safety." Darnell, 849 F.3d at 35.

The parties dispute whether Officer Coleman and Sergeant Galvin's conduct following Hulett's removal from the bus constituted "reasonable care" and, if not, whether the inadequacies were "sufficiently serious" to give rise to a violation of constitutional magnitude. Barnes v. Ross, 926 F.Supp.2d 499, 505 (S.D.N.Y. 2013); see also Feliciano v. Anderson, 2017 WL 1189747, at *10 (S.D.N.Y. Mar. 30, 2017) ("[I]n cases of delayed or inadequate care, 'it's the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant . . . .' ").

Officer Coleman and Sergeant Galvin caused Hulett to be transported to the Justice Center instead of to a hospital, even though Paramedic Maule raised the possibility that plaintiff was significantly injured and the officers could have readily observed the awkward placement of plaintiff's, left leg. Further, Sergeant Galvin himself dragged plaintiff across the ground and may possibly have experienced some change in plaintiff's behavior, or even the simple feeling of resistance giving way, that would signal plaintiff had suffered a serious injury, such as a broken hip. To be sure, the requirement of "reasonable care" does not demand perfection, and there is a compelling argument to be made that the officers and other law enforcement personnel on scene in the aftermath of the incident reasonably relied on the Rural/Metro defendants in deciding to transport plaintiff to the Justice Center rather than to the hospital.

But given the parties' dispute over what Hulett said and did, and what the officers knew, or should have known, during this point in the encounter, along with the undisputed fact that plaintiff somehow ended up lying in a cell at the Justice Center for hours before he eventually underwent emergency surgery to repair his broken left hip, it is hard to say, as a matter of law, that the officers' initial failure to take him to the hospital could never constitute deliberate indifference under these circumstances. See Feliciano, 2017 WL 1189747, at *13 ("Applying Darnell to claims of deliberate indifference to serious medical needs, the Court concludes that a defendant possesses the requisite *mens rea* when he acts or fails to act under circumstances in which he knew, or should have known, that a substantial risk of serious harm to the pretrial detainee would result."). Accordingly, summary judgment on this claim will be denied.

### 5. Municipal Liability

Before turning to the merits of Hulett's municipal liability claims, the parties' briefing has raised yet another ancillary issue that must be addressed. In addition to naming the City as a defendant and asserting individual-capacity claims against Officer Coleman and Sergeant Galvin, plaintiff has also asserted official-capacity claims against Chief Fowler, Officer Coleman, and Sergeant Galvin.

■■■ Of course, the individual-capacity claims against Officer Coleman and Sergeant Galvin remain viable at this juncture for the reasons set forth at length above. However, absent a claim seeking injunctive relief to remedy an *ongoing* violation of federal law, "a § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself." Lin, 66 F.Supp.3d at 353 (quoting Coon v. Town of Springfield, 404 F.3d 683, 687 (2d Cir. 2005)).

Indeed, "district courts have [regularly] dismissed official capacity claims against individuals as redundant or unnecessary where Monell claims are asserted against

an entity." Booker v. Bd. of Educ., Baldwinsville Cent. Sch. Dist., 238 F.Supp.2d 469, 475 (N.D.N.Y. 2002) (Munson, J.); see also Marcano, 38 F.Supp.3d at 251 (dismissing as redundant official-capacity claims against defendant-officers where plaintiff asserted § 1983 claim directly against municipality).

Hulett concedes as much in his opposition memorandum. Pl.'s Opp'n Mem. at 21 (conceding that the official-capacity claims are redundant). However, plaintiff hopes to resurrect an individual-capacity claim against Chief Fowler because, according to him, the evidence "establishes that [Chief] Fowler could have been sued in his individual capacity." Id. Accordingly, plaintiff seeks leave to amend his complaint.

This request is denied. First, absent from the blizzard of filings made by Hulett is any indication that he has complied with this District's Local Rule 7.1(a)(4), which requires a party seeking to amend a pleading to attach a copy of the proposed amended pleading to its motion papers. Second, any individual-capacity claim against Chief Fowler would require either his direct, personal involvement in the bus incident or for plaintiff to establish one of the Colon bases for supervisory liability. See Burwell v. Payton, 131 F.Supp.3d 268, 302 (D. Vt. 2015) ("Supervisory liability is a concept distinct from municipal liability, and is imposed against a supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.").

But the tenor of evidence in this case suggests Chief Fowler's involvement in the lengthy discovery process has been limited to his role as a policymaker for Monell purposes. Under these circumstances, the Court in its discretion will deny leave to amend, since plaintiff's claims will remain against the City itself for reasons that are discussed below.

### i. Monell Liability

"Before a municipality can be held liable under § 1983, it must be shown to have been 'the moving force of the constitutional violation.'" Carmichael v. City of N.Y., 34 F.Supp.3d 252, 262–63 (E.D.N.Y. 2014) (quoting Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)); see also Cash v. Cty. of Erie, 654 F.3d 324, 341–42 (2d Cir. 2011) (equating "moving force" with "proximate cause").

"In order to prevail on a claim against a municipality under section 1983 based on acts of a public official, a plaintiff is required to prove: (1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the municipality caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008) (citation omitted).

"The fifth element reflects the notion that 'a municipality may not be held liable under § 1983 solely because it employs a tortfeasor.'" Cowan v. City of Mt. Vernon, 95 F.Supp.3d 624, 643 (S.D.N.Y. 2015) (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)). Importantly, this element "can only be satisfied where a plaintiff proves that a 'municipal police of some nature caused a constitutional tort.'" Roe, 542 F.3d at 36 (citation omitted). However, a "municipal policy may be pronounced or tacit and reflected in either action or inaction." Cash, 654 F.3d at 334; see also Kern v. City of Rochester, 93 F.3d 38, 44 (2d Cir. 1996) ("The policy or custom need not be memorialized in a specific rule or regulation.").

"Accordingly, a plaintiff may satisfy this fifth element with evidence of: '(1) a formal policy officially endorsed by

the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.'" Benacquista v. Spratt, 217 F.Supp.3d 588, 599–600 (N.D.N.Y. 2016) (quoting Cowan, 95 F.Supp.3d at 637).

Of these four general categories for establishing Monell's "custom or policy" requirement, Hulett presses related claims under the third and fourth ones. Specifically, plaintiff contends that SPD's policies and training regarding tasers and use-of-force during the relevant time period were inadequate and, as a result, subordinate officers regularly used excessive force on citizens, including those who were physically and / or mentally disabled. Further, plaintiff contends that SPD supervisors were aware of, and tolerated, this widespread usage of excessive force by subordinate officers, as evidence by the consistent failure to discipline any of them.

■ "Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." Triano v. Town of Harrison, NY, 895 F.Supp.2d 526, 534 (S.D.N.Y. 2012) (quoting Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007)).

■ For example, "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of Monell." Batista v. Rodriguez, 702 F.2d 393, 397 (2d Cir. 1983).

■ "However, such a failure to act, train, or supervise can constitute a municipal custom 'only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need.'" Triano, 895 F.Supp.2d at 534 (citation omitted). The 'deliberate indifference' test 'is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.'" Brown v. City of N.Y., 2017 WL 1390678 at *13 (S.D.N.Y. Apr. 17, 2017) (quoting Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)).

■ After considering all of the evidence in the record and in particular parsing through the deposition testimony of Chief Fowler, Richard Shoff, Thomas Galvin, David Barrette, and David Brown, Hulett's Monell claim survives summary judgment and will remain for trial.

Among other things, Hulett's evidentiary submissions demonstrate that, during the relevant time period, there was a well-defined reporting procedure in place for instances in which SPD officers used force in the line of duty. See, e.g., Chief Fowler Dep. at 29–30; Thomas Galvin Dep. at 51–52. Notably, this reporting procedure included the preparation by a supervisor of a "Blue Team" report, a document nominally intended to provide a means to alert the SPD to the emergence of any troubling use-of-force patterns among the over 400 police officers the department employs. See, e.g., Chief Fowler Dep. at 29–31, 81; David Brown Dep. at 61–63.

Drawing all reasonable inferences in Hulett's favor, though, the evidentiary record also supports the conclusion that SPD's reporting procedure did little more than create the appearance of accountability among the SPD and its officers. At the outset, a review of the deposition testimony of the various supervisors indicate they were consistently unable, or unwilling, to testify as to any specific information that might prove relevant when actually critically evaluating use-of-force matters. Further, until recently there were no time limits in place for a supervisor to complete and submit a Blue Team report following a use-of-force incident. Chief Fowler Dep. at 42.

For instance, although the use-of-force incident in this case occurred in early May of 2013, the Blue Team report actually documenting the incident itself was not filed until Lieutenant Shoff submitted it in August of that year. Chief Fowler Dep. at 149–51; see also Shoff Dep. at 39, 58. In fact, the record reflects that the impetus for Shoff finally completing that Blue Team report appears to have been an up-tick in local news coverage of the May 3, 2013 incident.

It is this increased coverage that led to the report's absence finally being discovered by Chief Fowler, who directed it to be filed shortly afterward, possibly in anticipation of additional media scrutiny. Further, neither Officer Coleman nor Sergeant Galvin were disciplined as a result of any reports made in this case. Nor was Shoff disciplined, either for his late filing of the Blue Team report or for apparently failing to include certain required information in it. Brown Dep. at 101–03.

In addition, since 2012 the City has operated a Citizen Review Board ("CRB"), which "provides a civilian-administered process for receiving, investigating and reviewing complaints against members fo the Syracuse Police Department." Van Vleck Decl. Ex. 65. In 2013, for example, the CRB held thirty-five hearings, sustaining findings against one or more SPD officers on twenty-six occasions. Id. Of the twenty-six cases in which the CRB sustained findings that year, Chief Fowler had taken action on eighteen of them in time for the yearly report to be released. Id. Of those eighteen CRB cases, Chief Fowler imposed discipline in only three instances.[12] See generally Chief Fowler Dep. According to Chief Fowler's testimony, he cannot recall ever having disciplined one of his officers for inappropriate taser use. Id.

To be sure, the persuasive value of this evidence is not overwhelming. But much like in Galindez v. Miller, 285 F.Supp.2d 190 (D. Conn. 2003), Hulett's evidence is sufficient to create a jury question regarding whether, from the top down, the SPD took an unduly permissive attitude toward its officers' use-of-force prior to, and in the wake of, the May 3, 2013 incident involving plaintiff. See Vann v. City of N.Y., 72 F.3d 1040, 1049 (2d Cir. 1995).

Indeed, Chief Fowler, who has been in charge of the SPD since 2010 and who considers himself a "hands-on" leader, testified repeatedly at his deposition that a citizen has to obey a police officer's command, even if it is an unlawful one. Chief Fowler Dep. at 141–42 ("There's nothing in any law whatsoever that gives you or anyone else a right to disobey a command from a police officer . . ."), 267–68.

A jury could conclude that, as a result of SPD leadership's well-known permissive attitude toward compelled compliance with authority, subordinate officers, including Officer Coleman and Sergeant Galvin,

---

12. Recently, the CRB sued Chief Fowler in state court alleging that his conduct in re-

viewing complaints since 2011 had the effect of undermining the CRB's public mandate.

knew they would not be critically investigated, much less disciplined, for using force on citizens. Consequently, these subordinate officers felt empowered to use force with relative impunity and that, as a result, used excessive force on plaintiff in this case.

As the district court observed in Galindez:

> a reasonable jury could conclude from plaintiff's evidence that [the City] had a policy or pervasive pattern of deliberate indifference to the possibility that its officers were prone to use excessive force, as demonstrated principally by [the City's] failure to reasonably investigate complaints and the absence of punitive consequences for any accused officer, that such policy or pattern may have emboldened or implanted a sense of impunity in its officers, resulting in the challenged [conduct in this case], and that the offense would not have occurred had proper investigation and police discipline procedures been in place.

Galindez, 285 F.Supp.2d at 200. Accordingly, this claim remains for trial.

#### ii. State Law

■ The City defendants contend that any negligence-based cause of action asserted against the City must be dismissed because Hulett cannot recover "under broad principles of general negligence." Plaintiff, for his part, disavows any claim of negligent hiring or retention and instead claims he has asserted a viable claim against the City under the doctrine of *respondeat superior*. Pl.'s Opp'n Mem. at 36 ("Hulett did not bring a negligent hiring or retention claim but rather a respondeat superior claim.").

■ Generally speaking, "[u]nder New York law, a plaintiff may not recover under general negligence principles for a claim that law enforcement officers failed to exercise the appropriate degree of care in effecting an arrest or initiating a prosecution." Frederique, 168 F.Supp.3d at 484 (citation omitted); see also Rheingold v. Harrison Town Police Dep't, 568 F.Supp.2d 384, 395 n.3 (S.D.N.Y. 2008) ("To the extent that plaintiff is alleging an alternate theory of liability for false arrest, imprisonment and prosecution sounding in negligence, New York does not provide a cause of action under such a theory.").

With this general statement of the law in mind, it is understandable that the City defendants would mistakenly assert that it bars any tort claim against the City itself, since at first blush some courts seem to treat it that way. See, e.g., Frederique, 168 F.Supp.3d at 485 (appearing to dismiss vicarious liability claim against municipality on this basis).

■ But that is not quite right. "Although a municipality cannot be held vicariously liable on a section 1983 claim, under New York state law, a municipality may be held vicariously liable on state law claims asserted against individual officers under a theory of *respondeat superior*." Marcano, 38 F.Supp.3d at 267; see also Bektic–Marrero v. Goldberg, 850 F.Supp.2d 418, 434 (S.D.N.Y. 2012) ("The doctrine of respondeat superior renders a master vicariously liable for a tort committed by his servant while acting within the scope of his employment.").

■ Thus, "an employer may be held liable when the employee acts negligently or intentionally, so long as the tortious conduct is generally foreseeable and a natural incident of the employment." Judith M. v. Sisters of Charity Hosp., 93 N.Y.2d 932, 933, 693 N.Y.S.2d 67, 715 N.E.2d 95 (N.Y. 1999); see also Ramos v. Jake Realty Co., 21 A.D.3d 744, 801 N.Y.S.2d 566, 567 (N.Y. 2005) (recognizing the doctrine reaches even intentional torts, such as an employee's alleged assault, provided the

tortious conduct at issue occurred within the scope of employment). Indeed, "New York courts have held municipalities liable under a theory of *respondeat superior* for false arrest and assault and battery claims." Graham, 928 F.Supp.2d at 626 (collecting cases).

Hulett has several state law claims remaining against Officer Coleman and Sergeant Galvin, both of whom were allegedly acting within the scope of their employment with the City. Therefore, these state law claims remain viable against the City "due to the potential for vicarious liability for actions of its police officers as its employees." Williams v. City of White Plains, 718 F.Supp.2d 374, 381 (S.D.N.Y. 2010); Williams, 121 F.Supp.3d at 376 ("Under New York law, the City, just like any other private entity, is 'answerable for the conduct of its officers who commit common-law torts, such as assault and false imprisonment,' when they are 'acting in the course of their employment.'" (citation omitted)).

### 6. Officer Coleman's Liability under the ADA

 In opposition to the City defendants, Hulett also contends he has a viable claim for injunctive relief under the ADA against Officer Coleman in his official capacity. According to plaintiff, his amended complaint included an implicit request for prospective injunctive relief against this defendant.

 Any such claim will be dismissed. To be sure, courts in our Circuit have concluded that "law enforcement officers who are acting in an investigative or custodial capacity are performing 'services, programs, or activities' within the scope of Title II" of the ADA. See Williams, 121 F.Supp.3d at 368. And under certain fact patterns, the conduct of individual law enforcement officers is understood to give rise to a viable Title II claim:

(1) wrongful arrest, where police wrongly arrest someone with a disability because they misperceive the effects of that disability as criminal activity; and (2) reasonable accommodation where, although police properly investigate and arrest a person with a disability for a crime unrelated to that disability, they fail to reasonably accommodate the person's disability in the course of investigation or arrest, causing the person to suffer greater injury or indignity in that process than other arrestees.

Williams, 121 F.Supp.3d at 369 (internal citations and citation omitted).

But Hulett's argument on this point is focused only on seeking an injunction that would require Officer Coleman "to refrain from making assumptions about Hulett's abilities ..., making judgments about safety based on those assumptions ..., and prohibiting Hulett from standing on the bus or riding the bus." Pl.'s Opp'n Mem. at 33.

This request amounts to little more than the kind of "obey the law" injunction that is generally disfavored. Cf. Sec. & Exch. Comm'n v. Tourre, 4 F.Supp.3d 579, 598 (S.D.N.Y. 2014) ("[A]fter all, everyone is required to obey the law ....").

Assuming otherwise, the substance of this request would be more properly directed at Centro, the entity operating the bus, rather than Officer Coleman, who may have at best been acting as a Centro employee at the time. In any event, this claim fails to satisfy the "ongoing violation of federal law" requirement imposed by the doctrine of Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), since it is not apparent from the record that Officer Coleman has continued to prevent Hulett from riding the bus since the one-off incident that spawned this litigation. Accordingly, this claim will be dismissed.

### D. The Rural/Metro defendants

Hulett asserts a § 1983 medical indifference claim and a state law medical negligence claim against the Rural/Metro defendants, who contend dismissal of both claims is warranted. With respect to the § 1983 claim, defendants contend that neither Paramedic Maule nor EMT Dreverman were acting under "color of law" during the events in question.

With respect to the state law claim, defendants contend Hulett has failed to adduce evidence giving rise to a genuine dispute regarding whether the relevant standard of care was met in this case and, in any event, has failed to identify any injury attributable specifically to them.

Even assuming otherwise, defendants contend that Lon A. Fricano, Hulett's Emergency Medical Services ("EMS") expert, must be precluded from testifying at trial. Plaintiff opposes the dismissal of either of his claims and asserts that it is defendants' EMS expert, Anthony Guerne, who should be precluded from giving testimony at trial.

### 1. Medical Indifference under § 1983

 This claim must be dismissed. As Hulett acknowledges, private actors like the Rural/Metro defendants may only be held liable under § 1983 where the conduct at issue constitutes "state action," which only "occurs where the challenged action of a private party is 'fairly attributable' to the state[.]" Hollander, 624 F.3d at 33 (quoting Logan v. Bennington Coll. Corp., 72 F.3d 1017, 1027 (2d Cir. 1995)).

As the Second Circuit has explained:

> For the purposes of section 1983, the actions of a nominally private entity are attributable to the state when: (1) the entity acts pursuant to the "coercive power" of the state or is "controlled" by the state ("the compulsion test"); (2) when the state provides "significant encouragement" to the entity, the entity is a "willful participant in joint activity with the [s]tate," or the entity's functions are "entwined" with state policies ("the joint action test" or "close nexus test"); or (3) when the entity "has been delegated a public function by the [s]tate," ("the public function test").

Sybalski v. Indep. Grp. Home Living Program, 546 F.3d 255, 258 (2d Cir. 2008) (citation omitted).

Hulett has failed to adduce evidence that might permit a rational jury to conclude that the Rural/Metro defendants' conduct is actionable under § 1983 based on any of these three tests. Plaintiff, citing to Palmer v. Garuti, 2009 WL 413129 (D. Conn. Feb. 17, 2009), principally rests his opposition to the dismissal of this claim on the fact that SPD had a policy of always requesting Rural/Metro's assistance when someone is tased.

But Palmer is easily distinguishable. There, the ambulance company had entered into a written contract with the town that *required* it provide service at the discretion of the municipality's police force. Palmer, 2009 WL 413129, at *3 ("The contract provides in relevant part that [the ambulance service] must provide ambulance service 'whenever ... any duly authorized [town] police officer in the performance of his duty deems that emergency ambulance service is required by an individual ....'"). As the district court found, this "contract required the ambulance defendants to engage in the specific conduct complained of" by the plaintiff in that case, who alleged the ambulance service transported him to a medical facility against his will. Id. at *2–*3.

In this case, the existence of an SPD policy, written or otherwise, that compels SPD officers to always request the assistance of Rural/Metro does not satisfy the "compulsion test" or "joint action" test with respect to the Rural/Metro defen-

dants themselves, who by even Hulett's account operated independently of the agents of the municipality. See, e.g., Pl.'s Opp'n Mem. at 35 ("[Paramedic] Maule testified that Syracuse police officers did *not* instruct him not to render medical care to Hulett." (emphasis added)). Nor would the record evidence support a finding under the "public function" test. Grogan v. Blooming Grove Volunteer Ambulance Corp., 917 F.Supp.2d 283, 288 (S.D.N.Y. 2013) (collecting cases finding that ambulance services generally fail the "public function" test). Accordingly, this claim will be dismissed.

### 2. Medical "Negligence" under New York law

 The parties analyze Hulett's "medical negligence" using medical malpractice case law.[13] "Under New York law, a medical malpractice claim requires a showing of: (1) a deviation or departure from accepted practice, and (2) evidence that such departure was a proximate cause of injury or damage." Schoolcraft v. City of N.Y., 103 F.Supp.3d 465, 534 (S.D.N.Y. 2015) (citing Stukas v. Streiter, 83 A.D.3d 18, 918 N.Y.S.2d 176, 184 (N.Y. 2011)).

 "Expert medical opinions are typically required to substantiate or defeat such claims." Schoolcraft, 103 F.Supp.3d at 534; see also Kraft v. City of N.Y., 696 F.Supp.2d 403, 413 (S.D.N.Y. 2010) ("The plaintiff bears the burden of producing competent evidence, typically in the form of expert testimony, regarding applicable medical standards and the defendants' alleged failure to meet those standards.").

### i. Standard of Care

The Rural/Metro defendants' first argument is easily rejected. According to them, Hulett's medical negligence claim must be dismissed because they "met and exceeded the applicable standard of care when evaluating, treating and accepting the plaintiff's refusal of medical care on May 3, 2013." Defs.' Mem. at 12. Defendants go on to describe in detail how, according to their own version of events and supported by their own expert witness, this is actually what happened that day. Id. at 12–15.

But Hulett, supported by his own version of events and his own expert witness, disputes the factual circumstances surrounding the care, or lack of care, he received after being forcibly removed from the bus. To be sure, defendants vigorously dispute plaintiff's assertion that he did not refuse care, but plaintiff and his expert have proffered evidence that, if credited, could lead a jury to conclude otherwise. See Pl.'s Opp'n Mem. at 29–31. Accordingly, this argument does not provide a basis for granting summary judgment to either side in this dispute. See, e.g., Smith v. City of N.Y., 2015 WL 4643125, at *5 n.6 (S.D.N.Y. Aug. 5, 2015) (declining to resolve a "battle of the experts" on summary judgment).

### ii. Causation

 The Rural/Metro defendants next contend, again citing to their own testimony and their expert, that any allegedly improper conduct that might be attributable to them was not the proximate cause

---

**13.** "In determining whether an action sounds in medical malpractice or simple negligence, the critical question is the nature of the duty to the plaintiff which the defendant is alleged to have breached." La Russo v. St. George's Univ. Sch. of Med., 936 F.Supp.2d 288, 304 (S.D.N.Y. 2013) (citing Stanley v. Lebetkin, 123 A.D.2d 854, 507 N.Y.S.2d 468 (2d Dep't 1986). "When the duty arises from the physician-patient relationship or is substantially related to medical treatment, the breach gives rise to an action sounding in medical malpractice, not simple negligence." Id.; see also Naughright v. Weiss, 857 F.Supp.2d 462, 474 (S.D.N.Y. 2012) (analyzing claim against non-physician "zen healer" as one for medical malpractice under New York law).

of any injuries sustained by Hulett. Defs.' Mem. at 15–17. But just like the issue of deviation from the standard of care, "[e]xpert testimony is necessary to establish proximate cause, unless the matter is one which is within the experience and observation of the ordinary juror." Hersko v. United States, 2017 WL 1957272, at *6 (S.D.N.Y. May 11, 2017). Accordingly, this argument is also rejected.

### iii. The Parties' Experts

Finally, the parties seek to preclude each others' experts under Federal Rule of Evidence 702, which permits a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" to "testify in the form of an opinion or otherwise" provided that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied those principles and methods to the facts of the case. FED. R. EVID. 702.

 "The law assigns district courts a 'gatekeeping' role in ensuring that expert testimony satisfies the requirements of Rule 702." United States v. Farhane, 634 F.3d 127, 158 (2d Cir. 2011), cert. denied, 565 U.S. 1088, 132 S.Ct. 833, 181 L.Ed.2d 542 (2011). This role as gatekeeper requires a court to make three, related findings before permitting a person to testify as an expert: "(1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will 'assist the trier of fact.'" Valente v. Textron, Inc., 931 F.Supp.2d 409, 415 (E.D.N.Y. 2013) (quoting Nimely v. City of N.Y., 414 F.3d 381, 396–97 (2d Cir. 2005)).

 In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court set forth a non-exhaustive list of factors that bear on the reliability aspect of this inquiry: "(1) whether a theory or technique has been or can be tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). "These factors do not constitute, however, a definitive checklist or test. Rather, [t]he inquiry envisioned by Rule 702 is . . . a flexible one." Davis v. Carroll, 937 F.Supp.2d 390, 412 (S.D.N.Y. 2013) (citation omitted).

 The flexibility contemplated by Rule 702 is particularly helpful when an expert's testimony does not rest on traditional scientific methods. "In such cases, where a proposed expert witness bases her testimony on practical experience rather than scientific analysis, courts recognize that '[e]xperts of all kinds tie observations to conclusion through the use of what Judge Learned Hand called 'general truths derived from . . . specialized experience.'" Davis, 937 F.Supp.2d at 412 (quoting Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 149–50, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). "Thus, the Daubert factors do not necessarily apply even in every instance in which reliability of scientific testimony is challenged, and in many cases, the reliability inquiry may instead focus upon personal knowledge and experience of the expert." Id. (citation and internal quotation marks omitted).

 Whether based on traditional science or specialized experience, Rule 702

further mandates that an expert "stay within the reasonable confines of [their] subject area, and [thus] cannot render expert opinion on an entirely different field or discipline." Lappe v. Am. Honda Motor Co., Inc., 857 F.Supp. 222, 227 (N.D.N.Y. 1994), aff'd sub nom., Lappe v. Honda Motor Co. Ltd. of Japan, 101 F.3d 682 (2d Cir. 1996). In other words, "where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of their expertise, courts strike the extraneous testimony, as the admission of an expert does not provide that individual with carte blanche to opine on every issue in the case." Davis, 937 F.Supp.2d at 413.

■■■ As always, "[t]he proponent of the expert testimony bears the burden of 'establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied.'" Valente, 931 F.Supp.2d at 415 (quoting Williams, 506 F.3d at 160). Importantly, however, "[t]he Second Circuit has held that under the Federal Rules of Evidence, there is a general presumption of admissibility of evidence." Hilaire v. DeWalt Indus. Tool Co., 54 F.Supp.3d 223, 235 (E.D.N.Y. 2014) (citation and internal quotation marks omitted). Accordingly, "the rejection of expert testimony is the exception rather than the rule." FED. R. EVID. 702 advisory committee's note.

■■■ Ultimately, "a trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison.'" Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213–14 (2d Cir. 2009). However, "[t]o the extent that a party questions the weight of the evidence upon which the other party's expert relied or the conclusions generated from the expert's assessment of that evidence, it may present those challenges through cross-examination of the expert." R.F.M.A.S., Inc. v. So, 748 F.Supp.2d 244, 252 (S.D.N.Y. 2010). Simply put, "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002).

Notably, both sides of this dispute have retained EMTs as experts, yet each party claims the other's qualifications and expertise is insufficient to testify as to the relevant issues. After reviewing the expert opinions in connection with the parties' briefing, their attempts to exclude each others' experts are rejected at this juncture. See, e.g., Hollman v. Cty. of Suffolk, 2011 WL 2446428, at *14 n.13 (E.D.N.Y. June 15, 2011) (suggesting a certified EMT would be an appropriate qualification for an expert in similar case); Greenberg v. Rubin, 2001 WL 1722886, at *3 (N.Y. Sup. Ct. 2001) (considering affidavit from certified Paramedic as to appropriate standard of care).

### E. Spoliation

In each one of his three opposition filings, Hulett renews his long-running claim that the Centro defendants and the Rural/Metro defendants are both guilty of destroying, or at least failing to preserve, certain important evidence. According to plaintiff, Centro rendered unavailable important video evidence from the transit hub surveillance cameras and other buses that would show what happened after the officers dragged him off the bus. Plaintiff further claims the Rural/Metro defendants failed to preserve certain audio and physical records.

Hulett's request is made pursuant to Rule 37 of the Federal Rules of Civil Procedure, which explains that "[i]f electronically stored information that should have been preserved in the anticipation or con-

duct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the Court:

(1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or

(2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may;

 (A) presume that the lost information was unfavorable to the party;

 (B) instruct the jury that it may or must presume the information was unfavorable to the party; or

 (C) dismiss the action or enter a default judgment.

FED. R. CIV. P. 37(e).

Notably, this Rule underwent substantial revision as part of a series of amendments to the Federal Rules that became effective on December 1, 2015. See CAT3, LLC v. Black Lineage, Inc., 164 F.Supp.3d 488, 495 (S.D.N.Y. 2016). Prior to these amendments, "the Second Circuit permitted [spoliation] sanctions upon a finding that the party that had lost or destroyed evidence had acted negligently." Id. (citing Residential Funding Corp. v. DeGeorge Capital Corp., 306 F.3d 99, 108 (2d Cir. 2002).

However, as the language of the revised Rule makes clear, the Advisory Committee "explicitly rejected the Residential Funding standard, . . . and instead adopted the principle that severe sanctions are permitted only where the court finds an 'intent to deprive another party of the information's use in the litigation[.]' " CAT3, LLC, 164 F.Supp.3d at 495 (quoting FED. R. CIV. P. 37(e)(2)).

The spoliation in this case is alleged to have occurred prior to the effective date of this amendment. Nevertheless, courts have recognized "a presumption that a new rule governs pending proceedings *unless* its application would be unjust or impracticable." CAT3, LLC, 164 F.Supp.3d at 496 (discussing how amendments to the Federal Rules are disseminated by the U.S. Supreme Court).

 In this case, however, "applying the new rules to this motion would be neither just nor practicable." Learning Care Grp., Inc. v. Armetta, 315 F.R.D. 433, 440 (D. Conn. 2016). That is because Hulett raised this issue well before the effective date of the new rules, at a time when he could have obtained an adverse inference instruction simply by demonstrating that defendants were negligent. See id.; see also Creighton v. City of N.Y., 2017 WL 636415, at *19 (S.D.N.Y. Feb. 14, 2017) (discussing culpability standards).

### 1. The Centro defendants

 After reviewing the relevant materials, Hulett's primary spoliation claim is not nearly as meritless as the Centro defendants would have it seem. The parties agree that plaintiff's attorney sent a letter and an e-mail to Centro three days after the incident, on May 6, 2013, requesting "any and all" videotapes "relating to an incident that occurred on . . . or near" the Centro bus "while it was in the main Centro Terminal in Downtown Syracuse." See Van Vleck Decl. Ex. 91 at 2–4.

Rick Lee, Centro's Deputy Executive Director, readily acknowledged that "Centro anticipated that litigation would possibly be commenced" as a result of the incident that prompted Hulett's attorney's written communications. Lee Aff. ¶¶ 8–9. And Michael Walsh, Centro's Director of Security, acknowledged an awareness of the same communications in his deposition.

Walsh Dep. at 124–26. In fact, Walsh testified that certain surveillance cameras located around the exterior areas of the Centro terminal might well have captured the remainder of the incident, which took place in the curbside area after bus 1249 departed. See id. at 195–97.

Yet for whatever reason, Walsh and others concluded that the only video of the incident worth tracking down in response to Hulett's attorney's broadly worded written communication was surveillance video from inside the bus itself. Walsh Dep. at 195–97. Thereafter, the simple passage of time resulted in the loss of any remaining video evidence that might have proved relevant, since Centro's security system was programmed to automatically overwrite old recordings every month or so. See generally Walsh Dep.; Fitzgibbons Dep.; Klapheke Dep.

■■■■ This chain of events is hard to square with the relevant governing law, since "anyone who anticipates being a party or is a party to a lawsuit must not destroy unique, relevant evidence that might be useful to an adversary." Curcio v. Roosevelt Union Free Sch. Dist., 283 F.R.D. 102, 108 (E.D.N.Y. 2012) (citation omitted). "In this respect, 'relevance' means relevance for purposes of discovery, which is 'an extremely broad concept.'" Id. (quoting Orbit One Commc'ns, Inc. v. Numerex Corp., 271 F.R.D. 429, 436 (S.D.N.Y. 2010).

■■■■ In other words, "[w]hile a litigant is under no duty to keep or retain every document in its possession ... it is under a duty to preserve what it knows, or reasonably should know, is relevant in the action, is reasonably calculated to lead to the discovery of admissible evidence, *is reasonably likely to be requested during discovery* and/or is the subject of a pending discovery request." Curcio, 283 F.R.D. at 108 (citation omitted) (emphasis added).

It is recognized that under the pre-amendment Rule, an adverse inference instruction to the jury "may be appropriate in some cases involving the negligent destruction of evidence." Twitty v. Salius, 455 Fed.Appx. 97, 99 (2d Cir. 2012) (citation and internal quotation marks omitted); see also Stern v. City of N.Y., 665 Fed.Appx. 27, 29 (2d Cir. 2016) (summary order) (explaining prerequisites that must be satisfied before the discretionary grant of an adverse inference instruction may be warranted); West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 780 (2d Cir. 1999) (providing examples of appropriate adverse inference instructions).

■■■■ At the same time, however, such an instruction "is an extreme sanction and should not be imposed lightly." Curcio, 283 F.R.D. at 107 (citation omitted); see also Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 219 (S.D.N.Y. 2003) ("In practice, an adverse inference instruction often ends litigation—it is too difficult for the spoliator to overcome."). With all this in mind, as well as the reality that any missing video would not be relevant to any remaining claims against the Centro defendants themselves, the Court declines to award sanctions at this time.

### 2. The Rural/Metro defendants

■■■■ Hulett's spoliation claim against the Rural/Metro defendants rests on much weaker ground and is rejected at this juncture. According to the parties, Rural/Metro policy obligates paramedics faced with a patient refusal to alert an on-duty supervisor, either by calling a "recorded supervisor line" or by contacting dispatch, who "patches the paramedic through to a supervisor on a recorded line." Pl.'s Opp'n Mem. at 17.

At issue is Paramedic Maule's assertion that Hulett refused his offer of care, leading to the expectation that this refusal

would have been memorialized by virtue of a recorded call between Paramedic Maule and Ken Case, his supervisor that day, per Rural/Metro policy.

No such recording exists. According to the Rural/Metro defendants, this is because Paramedic Maule called Ken Case's cellular telephone directly rather than through dispatch as the policy required. And by the time plaintiff requested the cellular telephone records that might confirm this fact, they had been lost.

But unlike the Centro defendants, a review of the briefing and of the voluminous discovery record tends to indicate that the scope of Hulett's claims in this lawsuit expanded over time, meaning the Rural/Metro defendants were not initially on notice of the need to cast such a wide net in preparation for litigation until well after the events of May 3, 2013. Under those circumstances, any failure to preserve information—whether a recording, if it existed, or the cell logs, if it did not—cannot fairly be called "negligent." While Paramedic Maule's apparent departure from Rural/Metro policy may prove useful fodder for cross-examination, it is not a justification for sanctions.

### F. Hulett's Magistrate Appeal

Finally, Hulett challenges a March 17, 2017 discovery ruling entered by Judge Baxter denying his motion for sanctions and reducing a significant portion of the fee paid by the adverse party to plaintiff's EMS expert. In so doing, plaintiff rehashes a number of instances in which Judge Baxter "unfairly" applied certain time limitations to him while giving certain defendants the benefit of additional time. But after reviewing the transcript of Judge Baxter's decision as well as the parties' briefing, this appeal, like both of plaintiff's previous ones, will be denied.

## V. CONCLUSION

"Tasers came into widespread use for a reason. They were thought preferable to far cruder forms of force such as canines, sprays, batons, and choke-holds, and it was hoped that their use would make the deployment of lethal force unnecessary or at least a very last resort. None of this of course justifies their promiscuous use." Vill. of Pinehurst, 810 F.3d at 912 (Wilkinson, J., concurring in part). Although a few of Hulett's claims must be dismissed, the appropriate way to resolve the vast majority of them is by proceeding to a trial on the merits.

Therefore, it is

ORDERED that

1. The Centro defendants' motion for summary judgment is GRANTED in part and DENIED in part;

2. The City defendants' motion for summary judgment is GRANTED in part and DENIED in part;

3. The Rural/Metro defendants' motion for summary judgment is GRANTED in part and DENIED in part;

4. Hulett's cross-motions for summary judgment are DENIED;

5. Hulett's magistrate judge appeal is DENIED;

6. The § 1983 medical indifference claim against Michael Robinson is DISMISSED;

7. The § 1983 medical indifference claim against Rural/Metro, Matt Maule, and Kyle Dreverman is DISMISSED;

8. Hulett's official-capacity claims against Frank Fowler, William Coleman, William Galvin, Jr., Lester Wallace, and Michael Robinson are DISMISSED as redundant;

9. Hulett's ADA disability discrimination claim remains against Centro;

10. Hulett's NYSHRL disability discrimination claim remains against Centro, Lester Wallace, and Michael Robinson;

11. Hulett's § 1983 claims for excessive force, false arrest, malicious prosecution, and medical indifference remain against the City, William Coleman and William Galvin, Jr.;

12. Hulett's state law claims for assault and battery, false arrest and imprisonment, and malicious prosecution remain against the City, William Coleman and William Galvin, Jr.;

13. Hulett's medical negligence claim remains against Rural/Metro, Matt Maule, and Kyle Dreverman;

14. Hulett's request for sanctions is DENIED; and

15. A jury trial in this matter is scheduled for Monday, October 30, 2017 in Utica, New York.

IT IS SO ORDERED.

## AMENDMENT

The Clerk of the Court is directed to terminate the pending motions and to amend the caption in this action by (1) removing Frank Fowler; and (2) striking the official-capacity claims against the remaining defendants. As a result, the caption on all future submissions shall appear as follows:

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

BRAD L. HULETT, Plaintiff,

-v-

CITY OF SYRACUSE, WILLIAM COLEMAN, WILLIAM GALVIN, JR., CENTRAL NEW YORK REGIONAL TRANSPORTATION AUTHORITY doing business as CNY Centro, Inc., MICHAEL ROBINSON, LESTER WALLACE, EASTERN PARAMEDICS, INC., doing business as Rural/Metro Corporation,

AMENDMENT—Continued

MATT MAULE, and KYLE DREVERMAN, Defendants.

5:14–CV–152